715 So.2d 400 (1998)
STATE of Louisiana
v.
Christopher Joseph GUILLORY, Sr., Defendant-Appellant.
No. CR97-179.
Court of Appeal of Louisiana, Third Circuit.
March 11, 1998.
*402 Robert Richard Bryant, Jr., Lake Charles, for State.
*403 David J. Utter, Clive Adrian Stafford Smith, New Orleans, for Christopher Guillory.
Before SAUNDERS, SULLIVAN and GREMILLION, JJ.
SAUNDERS, Judge.
This is an appeal of three first degree murder convictions and three consecutive sentences of life imprisonment without benefit of probation, parole or suspension of sentence. The Defendant is Christopher Joseph Guillory, Sr.
The first trial of the Defendant ended on November 21, 1995, after jury selection with the presiding trial judge declaring a mistrial and then granting a change of venue. Venue for jury selection was moved to East Baton Rouge Parish and jury selection began on April 29, 1996. A twelve person jury, plus alternates, was selected by May 3, 1996. The guilt phase of the trial began in Lake Charles on May 6, 1996, and ended on May 10, 1996. It took the jury from 12:55 p.m. to 4:15 p.m. to return three verdicts of guilty of first degree murder. The penalty phase was conducted on May 11, 1996. After nearly two hours of deliberation, the jury was unable to unanimously agree on a verdict, and the trial judge then sentenced the Defendant to life imprisonment on each count without benefit of probation, parole or suspension of sentence. Formal imposition of the three consecutive sentences took place on September 13, 1996.

FACTS
Around 11:23 a.m. on Monday, March 22, 1993, Corporal Donald Shillow of the Lake Charles Police Department made a grisly discovery. Inside a machine shop that was also the residence of forty-year-old Daniel Dougay, he found the bodies of Mr. Dougay, his fifteen-year-old son, Robert Dougay, and Aaron Guidry. Aaron Guidry was a fourteen-year-old friend of Robert Dougay and he happened to be spending the night when the murders occurred. From the condition of the bodies, the police could tell that the murders occurred several days earlier.
The corrugated tin building at 2711 Church Street was a small machine shop where Daniel Dougay worked on cars. Lately, Mr. Dougay had been living in the cluttered machine shop even though it did not have electricity or toilet facilities. On the night of Friday, March 19, 1993, young Robert Dougay and Aaron Guidry spent the night with Mr. Dougay because they planned to go to the Iowa Rabbit Festival the next day. The last time anyone heard from any of the three men was at 11:30 p.m. on Friday night when Doris Ewalt spoke with her nephew, Robert Dougay, while he and Aaron Guidry were visiting his grandmother at Lake Charles Memorial Hospital.
On Monday, March 22, 1993, Michael Narcisse was working at Gates Food Store, a convenience store down the street from the machine shop, when his nephew told him that there were three dead bodies in Daniel Dougay's shop. Mr. Narcisse knew the victims and the Defendant, as he would see them often in the store. He refused to believe that anyone would kill Daniel Dougay, so he went to the shop and saw the bodies. Mr. Narcisse then called the police.
The police soon learned that Jeffery Tezeno had been living in the machine shop with Daniel Dougay because Mr. Tezeno had been thrown out of his home by his parents. Daniel Dougay took him in several months earlier, but threw him out of the machine shop shortly before the murders because Mr. Tezeno had stolen equipment used by Mr. Dougay. Through confidential informants, Lieutenant "Candy" Lewis of the Lake Charles Police Department learned that Jeff Tezeno was staying at the Melrose Motel on Broad Street in Lake Charles. When the desk clerk was shown a mug shot of Mr. Tezeno, she identified him and said he was staying in a room rented by the Defendant, Christopher "BB" Guillory. Lieutenant Lewis found Mr. Tezeno in the motel room, and he was taken to the police station for questioning.
Later, Mr. Narcisse found the Defendant at his parents' home, and they drove to the Gates Food Store where the two men talked and drank beer. The Defendant eventually said he wanted to meet with "Lieutenant" Lewis, so Mr. Narcisse called Lieutenant *404 Lewis to come to the store. When Lieutenant Lewis met with the Defendant, he advised the Defendant of his Miranda rights, and the Defendant was allowed to go to his parents' home to change clothes. While they drove to the police station, the Defendant and Lieutenant Lewis began to talk about Jeff Tezeno and the murders.
At that point in the investigation, the Defendant was not a suspect. Jeff Tezeno was the leading suspect and the Defendant was wanted simply as a possible witness to Mr. Tezeno's comings and goings since the murders. However, while Lieutenant Lewis talked with the Defendant he became very suspicious that the Defendant may have been with Mr. Tezeno when the murders occurred or the Defendant himself may have committed the murders. Lieutenant Lewis told the Defendant about his suspicions.
At the police station, the Defendant continued to talk with Corporal Kevin Kirkum while Lieutenant Lewis stepped away, and the Defendant eventually confessed that he committed the murders. After Lieutenant Lewis again talked with the Defendant, the lead investigator, Detective Denise Hughes, informed the Defendant of his Miranda rights, and the Defendant gave a videotaped confession.
It appears that the Defendant and Jeff Tezeno went on a weekend-long cocaine and marijuana binge while they were at the Melrose Motel. To get money to buy the drugs, the Defendant and Mr. Tezeno would steal items from Mr. Dougay's shop and pawn or sell the items to others. When the Defendant was brought to the police station, he turned over pawn slips from two local pawn shops; the items pawned were those used in automotive paint and body work done by Daniel Dougay at his shop. The Defendant also sold a four-wheeler and a Skil saw to Willie Fontenot the morning after the murders on Saturday, March 20, 1993. On the Friday night of the murders, both the Defendant and Jeff Tezeno had ridden to Mr. Fontenot's home on Daniel Dougay's Honda motorcycle and unsuccessfully tried to sell him an air compressor. In his confession, the Defendant said he went to the Dougay shop after midnight and knocked on the door asking if Jeff Tezeno was there, even though he knew that Jeff Tezeno was at the Melrose Motel. When Daniel Dougay answered the door, he told the Defendant that Tezeno was not there, and while he went back to sleep on the mattress on the floor, he complained that he would report Tezeno to the police because Tezeno had stolen a compressor from him. The Defendant said he held a pen-light in his mouth while he drew a .22 caliber pistol stolen from Daniel Dougay and proceeded to shoot Daniel Dougay, then Robert Dougay and finally Aaron Guidry. The coroner testified that all three men suffered two fatal gunshot wounds to the head.
After the shootings, the Defendant stole Daniel Dougay's car, but abandoned it later. It appears that the Defendant told Jeff Tezeno about the shootings and then he told others about the shootings. The victims' bodies remained in the shop until the police were called the following Monday. That is not to say that the bodies were not discovered or seen by anyone else until Monday; to the contrary, there were a couple of visits to the shed by the Defendant, Mr. Tezeno and others after the murders.
Early in the morning of Saturday, March 20, 1993, Vance Behn rode with Calvin Washington to see the Defendant and Jeff Tezeno at the Melrose Motel. While Calvin Washington went into the motel room, Vance Behn stayed in the car and the Defendant came to the car and spoke with Mr. Behn. As the conversation ended, the Defendant raised his shirt to show Mr. Behn Daniel Dougay's .22 caliber pistol and then told him, "Don't tell anyone I'm here." Later that same morning, the Defendant rode up to Donald Washington's home on a four-wheeler and told Donald, "I got it for[sic] a dead man." The Defendant also lifted his shirt to show Donald Washington the .22 caliber pistol. Between 9:00 and 10:00 a.m. on Saturday, the Defendant tried to sell other equipment from Daniel Dougay's shop to Shawn Bengel who was working at an automotive paint and body shop near the murder scene. When the police later showed a picture of the Defendant on television, Mr. Bengel recognized the man as the one who was riding a four-wheeler and trying to sell him automotive repair equipment. *405 As mentioned previously, the Defendant eventually sold the four-wheeler and a Skil saw to Willie Fontenot later on Saturday afternoon.
The police located the Defendant during the evening of Monday, March 22, 1993, and later that same evening, he gave a videotaped confession. During booking procedures, the Defendant made another incriminating statement to Deputy Sconnie Granger about how he used a gun to kill the three victims. The next day, the Defendant's court appointed attorney saw him in jail and suspected that the Defendant was still high on cocaine. A test of a urine sample given by the Defendant revealed the presence of both cocaine and marijuana in the Defendant's system more than seventeen hours after the confession. Both the State and the Defendant presented witnesses who testified about the possible effect the drugs would have on the Defendant's ability to voluntarily confess to the murders.
The Defendant contends that he did not kill the victims but rather Jeffery Tezeno committed the murders and was able to blame it on the Defendant. There was no direct evidence of the Defendant's guilt. All that the State had was circumstantial evidence, the Defendant's confession, and several other incriminating statements made by the Defendant. Jeffery Tezeno worked out a plea bargain agreement with the State that in return for his cooperation in this matter, he would be convicted of accessory after the fact and sentenced to five years in prison. For whatever reason, the State never called Jeffery Tezeno to testify at trial; the State called Ms. Evelyn Oubre, Mr. Tezeno's court appointed attorney, to testify about the plea bargain agreement. According to the Defendant, because Jeffery Tezeno did not have a driver's license, he could not rent the Melrose Motel room in his name nor could he pawn the tools and equipment taken from Daniel Dougay's shop. The Defendant could have called Jeffery Tezeno to testify, but then the Defendant would have been limited in his ability to impeach his own witness.
Finally, while the Defendant was in jail, he allegedly made another confession to another inmate, Mickle Cady. On April 14, 1993, the Defendant was accidentally brought to the family court's criminal nonsupport hearings along with Mr. Cady. While waiting to be returned to jail, the Defendant allegedly told Mr. Cady how he committed the murders. It appears that Mr. Cady was in jail on a number of pending charges in addition to criminal nonsupport of his child, but none of these charges have resulted in a conviction, and Mr. Cady has bonded out of jail and lives in Virginia. The Defendant alleges that Mr. Cady is a jailhouse snitch who fabricated the Defendant's confession in return for a "deal" with the State.

ERRORS PATENT
A review of the record reveals one error patent. La.Code Crim.P. art. 880 provides that when imposing a sentence, the court shall give the Defendant credit toward service of his sentence for time spent in actual custody prior to the imposition of sentence. The record indicates the trial court did not do so. La.Code Crim.P. art. 880 applies to life sentences. State v. Howard, 626 So.2d 459 (La.App. 3 Cir.1993). Thus, the sentence shall be amended to reflect that Defendant is given credit for time served prior to the execution of the sentence. La. Code Crim.P. art. 882(A). Resentencing is not required; however, this case is remanded in order for the trial court to amend the commitment and minute entry of the sentence to reflect that Defendant is given credit for time served prior to the imposition of his sentence. State v. McCartney, 96-58 (La. App. 3 Cir. 10/9/96); 684 So.2d 416, writ denied, 97-0508 (La.9/5/97); 700 So.2d 503 State v. Moore, 93-1632 (La.App. 3 Cir. 5/4/94); 640 So.2d 561, writ denied, 94-1455 (La.3/30/95); 651 So.2d 858. There are no other errors patent.

ASSIGNMENTS OF ERROR
The Defendant has organized his appellate brief into nine arguments; however, his formal list of assignments of error consist of 20 assignments of error with eight subparts and eight pertinent footnotes. They are as follows, with the accompanying footnotes also quoted:

*406 1. The verdict was against the weight of the evidence.
2. The verdict was against the law.
3. Jurors who should have been excused for cause were not excused.
4. Jurors who should not have been excused for cause were excused.
5. The defense was improperly limited in its voir dire.
6. The verdict was unduly influenced by the gruesome and prejudicial photographs introduced at the first phase of the trial.
7. The trial court failed to take appropriate action with respect to the defense objection to the various violations of discovery concerning an alleged racial statement attributed to Mr. Guillory by Michael Narcisse. No disclosure had been made of this statement pursuant to discovery, although it was clear from the prosecution questioning that it had been known to the prosecution. This was particularly important since it was the only evidence that even pretended that Mr. Guillory (as opposed to Tezeno) would have a motive for taking Danny Dougay's life.[1]
8. The trial court should not have prevented the defense from exhibiting evidence to the juryprimarily the videotape of the confessionthat had been properly introduced as evidence, at the time that the defense wanted to exhibit it, and prior to the defense having to cross-examine the relevant witness.
9. The trial court should not have allowed Evelyn Oubre to take the stand to buttress the non-existent testimony of the non-witness, Jeffery Wade Tezeno, in violation of Mr. Guillory's right to confrontation, and his other substantial rights.
10. The trial court should have granted a recess to secure the attendance of witness Marcus Snell at the trial, although he was properly under subpoena. This was critically important, since Mr. Snell would have provided the only source of evidence that (a) Tezeno had been at the crime scene on the Sunday (in contradiction to Tezeno's statement), (b) that Tezeno had threatened to "whup [Danny] up" just before the crime (contradicting Michael Narcisse's novel evidence that a threat had been made by Mr. Guillory).
11. The defense was improperly limited in its cross-examination of prosecution witnesses, including the defense effort to show that Mickle Cady was not to be trusted:
(a) Mickle Cady, characterized by Mr. Bryant as a "devastating" witness, had pending charges for [Controlled Dangerous Substance] and a felony in possession of a firearm. The only question the defense was allowed to ask was whether Cady had a deal with the State, which he denied. Linda Mitchell said that he was lying about this, since he had told her that he had an arrangement with a police officer that the cases would be dismissed. The prosecution argued that this was not true, and cross-examined Ms. Mitchell, asking her whether she knew whether the charges had been dismissed according to the agreementimplying that there was no such agreement.
(b) The defense was not allowed, at trial, to introduce the record of Mickle Cady's pending charges. These would have shown that Cady had been bonded out, had jumped bond, had been on the run for months (not being available for the suppression hearings held prior to trial) and had only recently been tracked down to Virginia. The defense was not allowed to show that he was being flown in from Virginia, and then flown back out, as opposed to being held in the [Calcasieu Correctional Center] for the next months before being sent to [Department of Corrections].
(c) Linda Mitchell would have elaborated on the scam going on her. She *407 would have testified that Cady had been a drug partner with her former husband, Robert Mitchell. This is corroborated by a police report made by none other than Lt. Candy Lewis that states:
It is a well known fact that Mitchell and Cady are good friends, further it is a known fact that Mitchell is a drug dealer (supplier) and Cady is a street front (street dealer) for Mitchell.

Report of Sgt. R. Lewis (Jan. 9, 1983).[2]
(d) The defense was only allowed to bring out Cady's prior convictions for [Controlled Dangerous Substance] and for theft of goods.[3] Cady had been arrested twice in three months for murder, and the defense was not allowed to show how he got out of these. On one of Cady's murders; on March 20, 1983according to the affidavit filed in the case by Sgt. Ron Lewis again"Michael Cady shot Kirby Joseph with a chrome plated revolver, brown handles, large caliber, and Robert Mitchell shot Terry Duhon. * * * On March 30, 1983 at approximately 7:30 P.M. Kirby Joseph died from the gunshot." He was therefore charged with murder.
(e) However, as Linda Mitchell would have testified from listing to Cady's own admissions, the two murderers threatened Duhon and "persuaded" him with a large amount of drugs to change his testimony so that it would appear to be self-defense. As a result, the charges were dropped.[4] This was weighty evidence of Cady's desire to do anything to get out of his charges.[5]
12. The defense was improperly prevented from presenting evidence at the trial concerning Tezeno's predilection for snitching on innocent people.
(a) Rhonda Daniels would have testified that she was involved with Tezeno for about three months. Tezeno took her car around 6:00 p.m. one evening, with her permission. By about 11:00 p.m. she had not heard from him, and she called the police to report that he was missing. Sometime later the police called her and told her they had her car but they needed her to come down to the station. She asked why and they told her because they had found "drug paraphernalia" (a pipe) in her car and that Tezeno had told them it was her pipe. She became very upset and said they could take any kind of drug test from her because she does not do drugs. She was furious with Tezeno because not only had he lied on her but he had jeopardized her custody of her child. He was later convicted on his guilty plea of this *408 charge. Ms. Daniels would say that she never met Chris Guillory, but that Tezeno talked about him all of the time. It was her impression that they were very good friends.[6]
(b) Kathy LaChappelle would have testified that she met Tezeno when she was 16 or 17. Tezeno called her one time although she had not given him her phone number. He told her he was in trouble and that if the police caught him, he wanted to use her as an alibi. She told him no and to never call again.[7]
(c) Clarissa Arceneaux, the former wife of Jeff Tezeno, could have testified to the fact that Tezeno admitted to her that he had told the police that Anthony Lamb, his accomplice, was the one who had done the burglary of Mayo's, of which he, too, was subsequently convicted.
13. On the question of the sexual assault, the defense tried to show the narrow minded approach of the State's star investigator, Sgt. Denise Hughes. The prosecution sought to pin this on Mr. Guillory. The defense therefore sought to determine that Hughes had made no effort to determine whether Tezeno had disposition to have been the one to have anal sex with Robert Dougay. Hughes had not bothered to even make inquiries at the jail. Jonathan Thierry would have testified that Tezeno was into anal sex with men at the CCC. Tezeno spent much of his time with the "wolves," "booty bandits," "sweet feet" (all names for homosexuals) on the tier. Tezeno had a very tight relationship with his cell mates and that they were usually young. One in particular, Larry James, was always with Tezeno. When James was shipped out to the Department of Corrections, Tezeno said "Damn, I got to get married again." Thierry queried what this was about, and Tezeno said, "My man gone."[8]
14. The defense was improperly prevented from presenting evidence at the trial from Robert Bartie. The prosecution coerced the defense witness to prevent him from testifying for the defense, by threatening him overtly with prosecution for potential criminal offenses, although when the prosecution wanted testimony from other witnesses (e.g., Tezeno and Cady) the prosecution gave immunity for far more significant testimony of much more dubious truthfulness. The defense should have been allowed to call Cady's lawyer, not to reveal privileged material, but simply to repeat what he had said in open court. The defense should alternatively have been allowed to admit Cady's statement against penal interest. Certainly, Mr. Bryant should not have been permitted to argue that there was no evidence that Tezeno had the gun on him.
15. The prosecution's objections to the defense closing argument were improperly sustained. In particular, when counsel was arguing that the jury had heard evidence that Tezeno habitually had the gun in question the Court sustained an objectionalthough this was precisely what Sgt. Hughes had testified. The same occurred with respect to Jay Vallaire's statement that Tezeno had the gun, and on other matters.
16. The prosecution's closing argument violated Mr. Guillory's fundamental rights, particularly insofar as Mr. Bryant commented repeatedly, over objection, *409 on the defense's alleged failure to call witnesses.
17. The instructions that were given were not proper statements of the law.
18. Proper instructions were denied in violation of the law, including an instruction on the unreliability of snitch testimony.
19. The jury was improperly reinstructed during deliberations without telling them about the law of principals, which was integral to the defense.
20. Mr. Guillory reiterates and reurges every motion, objection and argument made prior to or during the trial of this case.
The court notes that not all issues raised in the assignments of error are addressed in the brief and not all arguments presented in the brief are assigned as error. Moreover the Defendant has argued numerous facts or allegations of witnesses that were not presented at trial nor made part of a proffer. Thus, the factual allegations contained in Assignments of Error numbers 11(c), 11(e), 12(a), 12(b), 12(c), part of 13, plus footnotes 3, 4, 5, 6, 7, and 8 are not part of the record and should not have been argued to this court.
According to Uniform Rules, Courts of Appeal, Rule 2-12.4, assignments of error not addressed in the appellate brief may be deemed abandoned and not considered. State v. Broussard, 95-792 (La.App. 3 Cir. 12/6/95); 664 So.2d 835. Therefore, assignments of error numbers 1, 2, 6, 17 and 19 are considered abandoned and will not be addressed. Ironically, the Defendant does not address the issue of the insufficiency of the evidence although he argues throughout his brief that Jeffery Tezeno was the murderer.
The Defendant included a final "catch-all" assignment of error in number 20"Mr. Guillory reiterates and reurges every motion, objection and argument made prior to or during the trial of this case." Prior to trial, the Defendant filed over 100 motions, but in his appellate brief, the Defendant argues only three issues that were not specified as errors: Argument 1suppression of statements by the Defendant; Argument 2denial of motion to quash based upon discrimination in selection of grand jury foreman; and Argument 5suppression of fruit of illegal arrest. All three issues were the subject of pretrial writ applications and have previously been addressed by this court. Because the Defendant argued these three issues in his appellate brief, we have once again addressed them.
For ease of reference to both the Defendant's brief and the State's brief, we have organized the memorandum according to the nine arguments presented in the Defendant's appellate brief.

ARGUMENT NO. 1ASSIGNMENT OF ERROR NO. 20
The Defendant's first argument is that the trial court should have suppressed the videotaped confession and all other statements attributed to him. The basis for suppression is that the Defendant was intoxicated on cocaine at the time and he was self-destructive or suicidal. When the Defendant's court-appointed attorney visited him in jail the day after the confession, he suspected that the Defendant was high on cocaine and had the Defendant give a urine sample for testing. A test of the Defendant's urine sample given at 4:30 p.m. on the day after he made his confession revealed that it contained 355.6 nanograms of cocaine metabolites per milliliter and 65 nanograms of marijuana per milliliter. The argument presented here is identical to the issue presented in the pretrial writ application in State v. Guillory, 95-481 (La.App. 3 Cir. 6/29/95), writ denied, 95-1858, 95-1953, 95-1973, and 95-1974 (La.9/22/95); 660 So.2d 483.
The prior denial of supervisory writs does not bar reconsideration of an issue on appeal, nor does it prevent an appellate panel from reaching a different conclusion. State v. Fontenot, 550 So.2d 179 (La.1989); State v. Decuir, 599 So.2d 358 (La.App. 3 Cir.), writ denied, 605 So.2d 1095 (La.1992). In taking a second look at an issue, the appellate court may consider all pertinent evidence given at the trial. State v. Allen, 95-1754 (La.9/5/96); 682 So.2d 713, 731 n. 2, citing State v. Burkhalter, 428 So.2d 449, (La.1983); State v. Merchant, 490 So.2d 336, *410 n. 2 (La.App. 1 Cir.), writ denied, 496 So.2d 326 (La.1986). When a defendant does not present any additional evidence on this issue after the pre-trial ruling, the issue can be rejected on appeal. See, e.g., State v. Regan, 601 So.2d 5 (La.App. 3 Cir.1992), writ denied, 610 So.2d 815 (La.1993); State v. Wright, 564 So.2d 1269 (La.App. 4 Cir.1989). Judicial efficiency demands that this court accord great deference to its pretrial decision unless it is apparent that the determination was patently erroneous and produced unjust results. Decuir, 599 So.2d at 360. State v. Magee, 93-643 (La.App. 3 Cir. 10/5/94); 643 So.2d 497.
There was a pretrial suppression hearing on the issue of the effect of the Defendant's cocaine intoxication upon his ability to knowingly and voluntarily waive his rights and give a confession to the police. The only additional evidence presented at trial was the testimony of Dr. Sarah DeLand and the testimony of Dr. Earl Soileau, Jr., both expert witnesses who previously testified at the pretrial suppression hearing. The Defendant presented Dr. Sarah DeLand, a forensic psychiatrist, who met with the Defendant in the Calcasieu Correctional Center and viewed the videotape of his confession. Dr. DeLand gave an estimate that the Defendant had ingested one gram of cocaine before he gave his confession. Dr. DeLand testified that the Defendant was suffering cocaine intoxication at the time he gave the videotaped confession and that he was unable to knowingly waive his constitutional rights. The State presented the expert testimony of Dr. Earl John Soileau, Jr., a doctor specializing in addiction medicine, who testified that he viewed the videotaped confession and he did not see obvious signs of cocaine intoxication.
The Louisiana Supreme Court set forth the law concerning a claim of intoxication in the case of State v. Robinson, 384 So.2d 332 (La.1980):
Before a confession can be introduced in evidence, the state has the burden of affirmatively proving that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La.R.S. 15:451. It must also be established that an accused who makes a confession during custodial interrogation was first advised of his Miranda rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In Miranda, the United States Supreme Court observed: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been deprived of his freedom of action in any significant way." Spontaneous and voluntary statements, not given as a result of police interrogation or compelling influence, are admissible in evidence without Miranda warnings even where a defendant is in custody. State v. George, 371 So.2d 762 (La.1979); State v. Thornton, 351 So.2d 480 (La.1977); State v. Sockwell, 337 So.2d 451 (La.1976); State v. Thomas, 310 So.2d 517 (La.1975); State v. Higginbotham, 261 La. 983, 261 So.2d 638 (1972); State v. Hall, 257 La. 253, 242 So.2d 239 (1970). Where the free and voluntary nature of a confession is challenged on the ground that the accused was intoxicated at the time of interrogation, the confession will be rendered inadmissible only when the intoxication is of such a degree as to negate defendant's comprehension and to render him unconscious of the consequences of what he is saying. Whether intoxication exists and is of a degree sufficient to vitiate the voluntariness of the confession are questions of fact. State v. Rankin, 357 So.2d 803 (La.1978). The admissibility of a confession is in the first instance a question for the trial judge. His conclusions on the credibility and weight of the testimony relating to the voluntariness of a confession will not be overturned unless they are not supported by the evidence. State v. Hutto, 349 So.2d 318 (La.1977).
Id. at 335.
Later cases applying this rule have summarized the law to provide that a confession will be rendered inadmissible as a result of intoxication only when the intoxication is of such a degree as to negate the defendant's comprehension and to render him unconscious of the consequences of what he is saying. State v. Brooks, 505 So.2d 245 (La. App. 3 Cir.1987).
*411 A review of reported decisions reveals that the courts have admitted confessions in situations where the defendant has admitted to using drugs shortly before the confession. For example, in State v. Williams, 602 So.2d 318 (La.App. 1 Cir.), writ denied, 605 So.2d 1125 (La.1992), the defendant had a blood alcohol level of 0.169, and a drug screen test revealed the presence of cocaine metabolites and cannabinoids. However, there was no testimony given as to the amount of drugs the defendant had ingested, or when he had ingested the drugs. The court ruled that simply because a defendant had used drugs or alcohol, or both, did not per se render his confession invalid. These factors are simply one of the circumstances the court examines when assessing the voluntariness of a confession. In Williams, the court noted that the defendant was able to answer the questions with reasonably direct responses, expressed his thoughts in an appropriate manner, and he was able to correct written mistakes. Therefore, the court of appeal reversed the trial court's ruling suppressing the confession.
In State v. Davis, 92-1623 (La.5/23/94); 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994), the Louisiana Supreme Court upheld a trial court's decision that a defendant's confession was free and voluntary even though the defendant had smoked three or four rocks of crack cocaine twenty-four hours before his confession and he had consumed three or four beers earlier in the day of his confession. The court noted that the defendant appeared coherent, and he was able to explicitly recount the details of the crime.
In State v. Green, 613 So.2d 263 (La.App. 4 Cir.1992), the defendant sought to suppress his confession claiming he was under the influence of crack cocaine at the time of his confession. The detective who interrogated the defendant testified the defendant knew exactly what he was saying and had complete control of himself. The court refused to suppress the confession, finding the defendant freely and voluntarily waived his Miranda rights, and that he was not so intoxicated he was unconscious of the consequences of what he was saying.
In State v. Rose, 606 So.2d 845 (La.App. 2 Cir.1992), the defendant claimed the alcohol and cocaine she had consumed rendered her incapable of giving a free and voluntary statement. The detective interrogating the defendant noticed track marks on her arms and smelled alcohol on her breath, but felt her general demeanor and responses to his questions indicated an ability to comprehend the situation and to knowingly and intelligently waive the right to remain silent. Therefore, the defendant's motion to suppress was denied.
In the present case, two experts gave conflicting opinions about the Defendant's condition at the time of his confession. Also, all of the police officers who had contact with the Defendant on the night of his confession testified at the pretrial hearing that the Defendant did not appear intoxicated from cocaine. The test set forth in Robinson, 384 So.2d 332, is not simply did the defendant use alcohol or drugs, but did the use of these substances negate the defendant's comprehension and render him unconscious of the consequences of what he is saying.
Although the Defendant presented evidence concerning his intoxication at the time of his confession, the State presented sufficient evidence to prove that the Defendant freely and voluntarily waived his right to remain silent and to consult with an attorney before he gave his confession. The evidence presented did not establish that the Defendant was intoxicated to a degree that it negated his comprehension and rendered him unconscious of the consequences of what he said. Robinson, 384 So.2d 332. The remaining statements made by the Defendant to Mickle Cady and Deputy Sconnie Granger were also found to be voluntarily given, and we find that there was no error in this ruling.
This argument lacks merit.

ARGUMENT NO. 2ASSIGNMENT OF ERROR NO. 20
The Defendant next complains that the indictment should have been quashed because there was discrimination in the selection of the grand jury foreperson. Also, the Defendant argues that Judge Arthur *412 Planchard should have been recused. Again, the Defendant presented this issue in a pretrial writ application, State v. Guillory, 95-437 (La.App. 3 Cir. 5/8/95), writ denied, 95-1435 (La.9/22/95); 660 So.2d 483, and this court denied the Defendant's request for relief.
Turning to the merits of the Defendant's claim, this argument has been addressed in the case of State v. Young, 569 So.2d 570 (La.App. 1 Cir.1990), writ denied, 575 So.2d 386 (La.1991). The case of Young is factually similar to the present case since the defendant in Young introduced evidence about the racial makeup of the population of the parish but he did not introduce evidence about the racial makeup of the qualified members of the general venire or grand jury venire. As the Young opinion illustrates, the focus is not upon the general population, but upon those members of the general population qualified to serve on the grand jury.
By means of this assignment, defendant contends that the district court erred by denying his motion to quash the indictment based on the alleged racially discriminatory selection of grand jury forepersons. Defendant argues that his right to equal protection of the laws as guaranteed by the Fourteenth Amendment of the United States Constitution was violated by the systematic exclusion of blacks from service as grand jury foremen. Relying on Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979); Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); and Guice v. Fortenberry, 722 F.2d 276 (5th Cir.1984), defendant submits that, once he established a prima facie showing of racial discrimination in the selection of the grand jury foreperson, the burden shifted to the state to rebut the presumption by showing that the pattern of under representation of blacks was the result of a racially neutral selection procedure. On appeal, the state maintains that defendant failed to establish a prima facie case of discrimination.
In Rose v. Mitchell (quoting from Castaneda v. Partida), the Supreme Court set forth the standards applicable to a claim of racial discrimination in the selection of grand jury forepersons as follows:
"`[I]n order to show that an equal protection violation has occurred in the context of grand jury [foreman] selection, the defendant must show that the procedure employed resulted in substantial under representation of his race or of the identifiable group to which he belongs.' Castaneda v. Partida, 430 U.S., at 494, 97 S.Ct., at 1280. Specifically, respondents were required to prove their prima facie case with regard to the foreman as follows:
`The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied.... Next, the degree of under representation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as [foreman], over a significant period of time.... This method of proof, sometimes called the "rule of exclusion," has been held to be available as a method of proving discrimination in jury selection against a delineated class.... Finally ... a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.' Ibid.

Only if respondents established a prima facie case of discrimination in the selection of the foreman in accord with this approach, did the burden shift to the State to rebut that prima facie case. Id., at 495, 97 S.Ct., at 1280."
443 U.S. at 565, 99 S.Ct. at 3005.
See also Guice v. Fortenberry and State v. James, 459 So.2d 1299, 1307-1308 (La.App. 1st Cir.1984), writ denied, 463 So.2d 600 (La.1985), each of which utilized the three-part test of Castaneda in evaluating a claim of racially discriminatory selection of grand jury forepersons.
The applicable procedures pertaining to the selection of grand jury forepersons in East Baton Rouge Parish are contained in *413 La.Code Crim.P. art. 413, which provides, in pertinent part, as follows:
"The grand jury shall consist of twelve persons qualified to serve as jurors, selected or drawn from the grand jury venire."
"In parishes other than Orleans, the court shall select one person from the grand jury venire to serve as foreman of the grand jury. The sheriff shall draw indiscriminately and by lot from the envelope containing the remaining names on the grand jury venire a sufficient number of names to complete the grand jury."
The record reveals that on August 11, 1988, defendant filed a motion to quash the indictment on the basis of his claim of intentional, discriminatory and systematic exclusion of blacks from the position of grand jury foreperson in East Baton Rouge Parish. On September 7, 1988, a hearing was held in regard to this motion.
Id. at 573-574. (emphasis added; footnotes omitted).
The evidence presented by the defendant at the hearing in Young was similar to the evidence introduced by the Defendant at the pretrial hearing in the present case. The defendants in both cases introduced evidence concerning the manner of selecting the general venire from the list of registered voters and licensed drivers; the racial composition of the grand jury forepersons for years past was introduced; and the defendants also introduced the latest census data to establish the racial composition of the parish affected. In the present case, counsel for the defendant introduced additional evidence concerning the percentage of females in the population and grand jury forepersons. In neither case did the defendants introduce any evidence about the racial or gender composition of the general venire. As the Young opinion explains, this is fatal to a defendant's claim of racial discrimination.
It is clear that the defendant has established the first part of the Castaneda test, as the black race, of which he is a member, is a recognizable distinct class which has been singled out for different treatment. See State v. James, 459 So.2d at 1308. In regard to the third part of the Castaneda test, one may assume for purposes of this case that the East Baton Rouge Parish method of selecting a grand jury foreman is susceptible of abuse. Cf. Rose v. Mitchell, 443 U.S. at 565-66, 99 S.Ct. at 3005. Accordingly, we focus on the remaining element of the Castaneda test, requiring that defendant demonstrate the degree of under representation by comparing the proportion of the group in the total population to the proportion called to serve as grand jury foremen over a significant period of time.
Defense exhibit D-5 reveals that, according to the 1980 United States Census, blacks made up 31.3 percent of the total population of East Baton Rouge Parish; and, as per the stipulation of defendant and the state that two of thirty individuals selected as grand jury forepersons over the period of 1978 to 1988 were black, only 6.6 percent of those individuals were black.
However, since the general venire in East Baton Rouge Parish is composed of "qualified" persons drawn from a random list of registered voters and licensed drivers in that parish, the total percentage of a particular minority in the general population does not have a direct bearing on the make-up of the general venire, from which the grand jury venire is randomly drawn, and the grand jury foreman is selected. Rather, it is the percentage of the particular minority in the general population who are either licensed drivers or registered voters, and who meet the five qualifications necessary to become a juror, which is the appropriate percentage to compare with the actual percentage of minority grand jury foremen.
Therefore, in order to make a prima facie showing of discrimination in the selection of a grand jury foreman, the defendant must show a disproportion over a significant period of time between the percentage of an identifiable minority in the general venire or grand jury venire, and the percentage of minority forepersons during that time; and that the selection process is susceptible *414 of abuse. That is, the defendant must show that the percentage of minority persons in the general population who are qualified to serve as grand jurors is disproportionate to the actual number of minority grand jury forepersons over a significant period of time to establish a prima facie case. Alexander v. Louisiana, 405 U.S. 625, 630, 92 S.Ct. 1221, 1225, 31 L.Ed.2d 536 (1972); Newman v. Henderson, 539 F.2d 502, 505 (5th Cir.1976), cert. denied, 433 U.S. 914, 97 S.Ct. 2986, 53 L.Ed.2d 1100 (1977); Preston v. Mandeville, 428 F.2d 1392 (5th Cir.1970); Labat v. Bennett, 365 F.2d 698 (5th Cir.1966), cert. denied 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967); see also, Foster v. Sparks, 506 F.2d 805, 832-33 (5th Cir.1975); United States v. Jenison, 485 F.Supp. 655, 663 (S.D.Fla.1979). To hold otherwise would be to ignore the fact that a substantial percentage of the general population does not meet the five qualifications which must be met in order to serve on a jury, or in this case as grand jury foreman.
In this case the defendant failed to show the percentage of minority persons in the general or grand jury venires, or the percentage of qualified minority persons in the general population, therefore the trial judge was correct in finding that the defendant had not made the required prima facie showing. This assignment lacks merit.
Id. at 575-576 (emphasis added; footnotes omitted).
The Young case is nearly identical to the present case, and we find that the Defendant in the present case has failed to present sufficient evidence to support his claim of racial and gender discrimination. The focus is not the percentage of eligible blacks and females from the entire population of the parish, but instead the percentage of eligible blacks and females from the general venire and what percentage of this group was chosen to be grand jury forepersons.
No additional evidence has been presented on this issue and thus, we find this claim lacks merit.

ARGUMENT NO. 3  ASSIGNMENT OF ERROR NOS. 10, 12 & 14
The third argument of the Defendant raises several separate issues. First, the Defendant claims the trial court erred in refusing to enforce a valid subpoena for a defense witness, Marcus Snell. The State responded that the Defendant is responsible for getting his witnesses to trial. The Defendant had subpoenaed Mr. Snell, but he left during the trial to go to a funeral in Detroit.
Marcus Snell lived across the street from Daniel Dougay's shop. If he could have testified at trial, Mr. Snell would have told about an argument between Jeff Tezeno and Daniel Dougay one week before the murders. It appears that Jeff Tezeno was angry that Mr. Dougay had not paid the electric bill and the electricity had been cut off to the shop. During the argument, Tezeno threatened to whip Dougay. Mr. Snell would have also testified that he saw Tezeno at the shop on the Sunday after the murders. Finally, Mr. Snell told counsel for the Defendant that he had a friend who was in jail with Tezeno and Tezeno told this friend, who Mr. Snell refused to identify, that Tezeno said that after he and the Defendant used all of their crack cocaine, they needed some money so they went to Daniel Dougay's. When Dougay objected to them taking tools, the Defendant pulled out a gun and Dougay was shot while struggling with the Defendant for the gun.
The State noted that Michael Narcisse had already testified about threats being made against Daniel Dougay a week prior to the murders and that Detective Denise Hughes had already told the jury that Tezeno admitted he had been to the shop several times after the murder. Therefore, the information the Defendant wanted to present through the testimony of Marcus Snell was simply cumulative of what had already been presented. As to the hearsay about what the "friend" of Mr. Snell heard Tezeno say while in jail, the State said it would object to this "double hearsay."
The trial judge refused to grant a recess or a continuance since the witness was not crucial to the Defendant's case.
*415 The second claim of the Defendant is that he was prevented from introducing evidence about Tezeno's habit of snitching on innocent people. The Defendant called Rhonda Walker to the stand to testify how Tezeno gave a statement to the police accusing her of owning drugs and drug paraphernalia that eventually Tezeno pled guilty to possessing; however, when counsel for the Defendant began to question Ms. Walker on this issue, the State objected on the grounds of relevancy. The Defendant also discusses the proposed testimony of Kathy LaChappelle and Clarissa Arceneaux, but these witnesses were never called to testify.
The State argued that this information was irrelevant to the guilt or innocence of the defendant. Lack of relevancy was the ground for the objections at trial. Also, the proper procedures for impeaching a witness are provided by La.Code Evid. art. 607, but before a witness may be impeached, he must first be called to testify. In the present case, Tezeno was never called to testify and thus, his credibility could not be impeached. Therefore, the trial court did not err in sustaining the objections to this testimony.
The third claim of the Defendant is that he was prevented from presenting evidence from Robert Bartie. The Defendant claims this witness was coerced from testifying on behalf of the Defendant by threats of prosecution from the State. Allegedly, Robert Bartie sold crack cocaine to the Defendant and Tezeno. While Bartie was testifying, the Defendant asked him if he sold crack cocaine to the Defendant and Tezeno. When asked this question, Bartie invoked his Fifth Amendment privilege. The trial court refused to order the State to grant Bartie immunity, and the State said if Bartie admitted selling crack cocaine, then it would consider filing criminal charges.
The Defendant does not state why Robert Bartie was a crucial defense witness; both the State and defense acknowledged that at one point, Mr. Bartie sold crack cocaine to the Defendant and Tezeno. Moreover, it is not known how this testimony would have helped the Defendant. As such, the trial court did not err in sustaining the objections of the State and in refusing to order the State to grant Mr. Bartie immunity from his admissions.
The Defendant added in a footnote that he was not allowed to show the videotape of his confession when he wanted to do so. The Defendant wanted to cross examine the State's witnesses by going through the videotaped confession and examining the accuracy of assertion made by the Defendant. The State objected to doing so during the presentation of its case-in-chief. The order of presentation of evidence is governed by La.Code Crim.P. art. 765, and the Defendant has cited no authority for varying the order of presenting evidence; the State must present all of its evidence during its case-in-chief before the Defendant may present any evidence he may have. See State v. Thomas, 395 So.2d 802 (La.1981). Also, neither the trial judge nor the Defendant may control the manner in which the State chooses to present its evidence. Thus, this argument is without merit.
In summary, the Defendant argues that he was denied his constitutional right to present a defense. However, the Defendant's right to present a defense does not allow him to ignore the provisions of jurisprudence and the Code of Evidence. We find no merit in these arguments.

ARGUMENT NO. 4ASSIGNMENT OF ERROR NOS. 9, 11, & 13
The fourth argument of the Defendant is that he was improperly prevented from confronting a witness against him. Again, this argument contains several separate issues. The summary of this argument is that the Defendant was not allowed to introduce impeachment evidence.
First, the Defendant complains that he was limited in his impeachment of Mickle Cady. The Defendant could not introduce the record of Cady's pending criminal charges. La.C.E. art. 609.1 limits impeachment to convictions and not arrests or pending charges. The Defendant was able to present to the jury the record of Cady's prior convictions. We find no merit in this argument since during the State's direct examination of Cady, he acknowledged he had been in jail *416 for pending charges of illegal possession of a firearm by a convicted felon, possession of CDS and failure to pay child support.
What the Defendant wanted to present to the jury was that Cady had worked out a "deal" with the State. Both the State and Cady denied that there was any "deal." However, Linda Mitchell, a former girlfriend of Cady, testified that he told her he had a "deal" with the State concerning a court case in which he would have to return to Lake Charles and testify. The Defendant introduced Linda Mitchell's testimony about Cady's admission to her that he had worked out a "deal" with the police for his testimony against the Defendant. The jury was free to accept or reject, in whole or in part, the testimony of the witnesses. Thus, the Defendant was able to impeach Cady.
The second issue raised by the Defendant is that he was not allowed to establish that Tezeno committed the sexual assault on Robert Dougay. When the police discovered the bodies of the victims, it was apparent that the body of Robert Dougay had been sexually assaulted; however, no rape kit was performed on the body or if one was performed, no results were obtained. The Defendant wanted to present testimony about Tezeno's homosexuality and bisexuality, and his preference for anal sexual intercourse. The State argued that this information was irrelevant. The Defendant did not choose to call Johnathan Thierry to testify after the court ruled that any testimony about Tezeno's sexual practices while in jail would be irrelevant. Thus, any discussion in brief about the proposed testimony of Mr. Thierry is improper because the Defendant did not present this testimony, not even by proffer, and he did not object when the trial judge ruled that it would be irrelevant. Thus, this argument is without merit.
Furthermore, during the testimony of Detective Denise Hughes, she acknowledged that Tezeno gave a videotaped statement March 23, 1993, and he made no mention of the Defendant committing any sexual assault upon any of the victims, but later, in April of 1993, Tezeno gave another statement about the sexual assault. According to Tezeno, the Defendant told him that after shooting all of the victims, the Defendant anally raped Robert Dougay and that afterwards, the Defendant saw blood on his penis and lower abdomen. However, the photographs of the victims show that there was no blood on Robert Dougay except on his head where he was shot. Counsel for the Defendant questioned how Detective Hughes could believe Tezeno when he obviously gave a statement that was false. Again, this was an issue that the jury could weigh in determining the believability of the State's witnesses.
The Defendant's next argument concerns the testimony of Evelyn Oubre, counsel for Jeffery Tezeno. The Defendant complains that the State used Ms. Oubre's testimony to introduce hearsay and prevent the Defendant from cross-examining Tezeno. Ms. Oubre was called as a witness by the State to reveal that she had approached the State to enter into a plea bargain agreement on behalf of her client. At the beginning of her testimony, Ms. Oubre was excused from the courtroom to confer with her client and essentially get his waiver of the attorney-client privilege. However, while Ms. Oubre was under direct examination by the State, she was never asked the precise terms of the plea bargain agreement. She was asked why she sought a deal for her client, and she said it was after she had gone over the facts of Tezeno's involvement in the crime. The Defendant immediately objected that the State was trying to introduce hearsay rather than calling Jeffery Tezeno to the stand. The objection was overruled and the State then asked Ms. Oubre to describe Tezeno's demeanor when he would talk to her about the crime and "what he saw that night." The Defendant again objected, and the objection was overruled.
During cross-examination of Ms. Oubre, it was revealed that Jeffery Tezeno would be charged with one count of accessory after the fact of the murders and the State would recommend two years in prison. Since Tezeno had been in jail from March of 1993 until December of 1995, two and one-half years, he would not have to serve any more time in jail. Also, the defense brought out the fact that in December of 1995, the State had *417 agreed to a reduction of Tezeno's bond from the original $200,000.00 amount to $3,000.00.
It is not clear why the State called Ms. Oubre to the stand; the State never called Tezeno to testify. Therefore, there was no need to reveal the plea bargain agreement reached between the State and Tezeno. La. Code Evid. art. 607 provides, in paragraph B. Time for attacking and supporting credibility. The credibility of a witness may not be attacked until the witness has been sworn, and the credibility of a witness may not be supported unless it has been attacked....
It is argued that the State, in an attempt to support the credibility of Jeffery Tezeno before he was called as a witness, violated the provision of Article 607. However, a violation of Article 607 will not result in automatic reversal of a conviction. "An erroneous trial court ruling on allowing the corroboration of a witness before his credibility is at issue is not reversible error unless the defendant alleged or showed how he was prejudiced by the judge's ruling." State v. Joe, 502 So.2d 270, 272 (La.App. 3 Cir.1987), citing State v. Boyd, 359 So.2d 931 (La.1978); State v. Passman, 345 So.2d 874 (La.1977); and State v. Carney, 476 So.2d 364 (La.App. 4 Cir.1985). Even if the Defendant were able to prove that Jeffery Tezeno lied to the police and to his attorney about the extent of his involvement in the murders, the Defendant would still have to contend with the fact that he made a lengthy videotaped confession of his involvement in the crimes and that he made several additional incriminating statements to others about his own involvement. All that the jury had to decide was whether the defendant was guilty of three murders; the culpability of Jeffery Tezeno was not at issue. Therefore, we find that the error, if any, in admitting the testimony of Ms. Oubre cannot result in reversal of the Defendant's conviction.

ARGUMENT NO. 5ASSIGNMENT OF ERROR NO. 20
The Defendant contends the trial court should have suppressed all evidence derived from his illegal arrest. The Defendant argues that since the police had no probable cause to detain him or arrest him, that all fruit of his illegal arrest should be suppressed; this includes not only the evidence seized but also all statements given by Mr. Guillory. This issue is identical to the previous pretrial writ application in State v. Guillory, 95-482 (La.App. 3 Cir. 6/29/95), writ denied, 95-1973 (La.9/22/95); 660 So.2d 483.
In the case of State v. Simms, 571 So.2d 145 (La.1990), the Louisiana Supreme Court clarified the issue of when an arrest occurs:
An arrest occurs when the circumstances indicate an intent by the police to effect an extended restraint on the liberty of the accused, rather than at the precise time the officer tells the accused he is under arrest. La.Code Crim.P. art. 201; State v. Rebstock, 418 So.2d 1306 (La.1982).
Id. at 148.
The United States Supreme Court has emphasized that "any assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account `all the circumstances surrounding the incident' in each individual case." Michigan v. Chesternut, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). A seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Simms, 571 at 148 (citations omitted).
In the present case, the Defendant was not formally arrested until he reached the police station and confessed to the triple murders, but he was detained after he lied to Lieutenant Lewis and claimed that he had not seen Jeffery Tezeno in three months. The court in Simms stated that having determined that a defendant was under arrest, the next consideration is whether the police at that point had the necessary probable cause to arrest the defendant. Probable cause to arrest exists when the facts and circumstances within the officer's knowledge are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. Id. The determination of probable cause, although requiring something more than bare suspicion, does not require evidence sufficient to support a conviction. *418 Probable cause, as the name implies, deals with probabilities. The determination of probable cause, unlike the determination of guilt at trial, does not require the fine resolution of conflicting evidence that a reasonable doubt or even a preponderance standard demands, and credibility determinations are seldom crucial in deciding whether the available evidence supports a reasonable belief that the person to be arrested has committed a crime. The determination of probable cause involves factual and practical considerations of everyday life on which average men, and particularly average police officers, can be expected to act. Id.
From the moment that Lieutenant Lewis first questioned the Defendant, he was suspicious of the Defendant. The Defendant immediately lied to Lieutenant Lewis when he claimed that he had not seen Jeffery Tezeno in approximately three months, yet the motel room where Mr. Tezeno was staying at the time of the murders was registered in the Defendant's name. Furthermore, as the Defendant spoke more and more to Lieutenant Lewis, he revealed more information about the murders. Lieutenant Lewis became suspicious that the Defendant, Mr. Guillory, was involved as an accessory after the fact to the murders or had more knowledge about the murders than he was revealing to Lieutenant Lewis.
The court in Simms noted that:
Each fact known to the police at the time of the arrest, when viewed alone, might be explained consistently with innocence. However, probable cause will not be defeated simply because innocent explanations for an activity can be imagined. 1 W. LaFave, Search and Seizure Sec. 3.2(e) (1987). Probable cause exists if a "succession of superficially innocent events had proceeded to the point where a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one". Id.

. . . .
It is not a prerequisite for the existence of probable cause that the police know at the time of the arrest that a particular crime has definitely been committed. State v. Collins, 378 So.2d 928 (La.1979); State v. Drott, 412 So.2d 984 (La.1982). Although certainty of knowledge of the commission of a particular crime is frequently an important factor in the determination of probable cause, probable cause may exist when the commission of a crime has not been definitely established, but is reasonably probable under the totality of the known circumstances.
Id. at 149.
Looking at the totality of the circumstances known to Lieutenant Lewis in the present case at the time he asked the Defendant to accompany him to the police station, Lieutenant Lewis knew that a triple murder had been committed and that the Defendant had been staying in a motel room with the chief suspect at the time the murders had been committed. Lieutenant Lewis also knew that the Defendant was lying when he claimed that he had not seen Jeffery Tezeno in approximately three months. Between the time that Lieutenant Lewis asked the Defendant to accompany him to the police station and they first arrived at the police station, the Defendant began to reveal more information about the crimes which raised Lieutenant Lewis's suspicions to the fact that he felt the Defendant was an accessory after the fact or otherwise involved in the commission of the crime.
Based on the totality of the circumstances, Lieutenant Lewis had probable cause to believe the Defendant had committed a crime, probably accessory after the fact, and he was therefore justified in detaining the Defendant. Therefore, the ruling of the trial court, denying the motion to suppress the fruits of the illegal arrest are hereby upheld. It is important to note that the Defendant cooperated with the police at all times and he was the person who contacted Lieutenant Lewis. When Lieutenant Lewis arrived at the Gates Food Store, he did not suspect that the Defendant was a participant in the crime. Thus, this argument is without merit.

ARGUMENT NO. 6ASSIGNMENT OF ERROR NO. 7
This argument concerns several alleged discovery violations. Only one violation is *419 addressed in Defendant's brief, and two others are relegated to a footnote without any explanations.
First the Defendant argues the State failed to reveal an alleged racial remark the Defendant made to Michael Narcisse. Michael Narcisse worked at Gates Food Store down the street from Daniel Dougay's shop; he would often see Daniel Dougay, Jeffery Tezeno and the Defendant at the store. While testifying on direct, Mr. Narcisse told of how the Defendant was in the store at the same time as Daniel Dougay, and the Defendant said he did not like "these honkeys" and he made a vague threat. The Defendant immediately objected since he had not been told of this statement in discovery. However, the State argued that it was not aware of it until Michael Narcisse testified at trial. Then Mr. Narcisse admitted that the State did not know of it because they "never asked me either."
We find no discovery violation since the State was not aware of the statement until the witness said it at trial.
The remaining claims, in footnote 1 are, "The prosecution had also failed to provide Willie Fontenot's exculpatory statements (he had apparently denied knowing anything about the criminal activities that he later discussed on the stand), and Donald Washington's verbal perambulations." No explanation is given about what were Donald Washington's "verbal perambulations" and as such, this issue cannot be discussed.
The statement from Willie Fontenot concerned his initial denial of purchasing anything from the Defendant and Tezeno. When Sergeant Ray Laviolet first went to Mr. Fontenot to recover the items that the police had learned Tezeno and the Defendant had sold to him, Mr. Fontenot initially denied knowing anything about it. On the stand, Mr. Fontenot admitted he was afraid he would be charged with a crime if the items were stolen. The day after the discovery of the bodies, Mr. Fontenot admitted his purchases and returned the items to the police. The Defendant was able to fully cross-examine Mr. Fontenot about his initial denial; this fact does not appear to be favorable to the Defendant nor in any way exculpatory.
For whatever reason, the initial denial by Mr. Fontenot was not included in his written statement given to the police. However, the Defendant did not object to the admission of this evidence. At trial, the Defendant simply asked that the State turn over all other Brady material. We find that Mr. Fontenot's initial denial that he had purchased items from the Defendant and Tezeno is not exculpatory evidence and thus there could be no Brady violation. Furthermore, the Defendant did not object, but simply asked for any additional Brady information.

ARGUMENT NO. 7ASSIGNMENT OF ERROR NOS. 15 & 16
The Defendant's seventh argument concerns two objections to closing arguments. First the Defendant contends that the State improperly referred to the Defendant's failure to call witnesses. Second, the Defendant argues that he was improperly limited in his closing argument.
The Defendant first argues that the State improperly placed a burden of proof upon the Defendant when it referred to the Defendant's failure to present certain witnesses. The State replied that the objectionable argument occurred during the State's rebuttal to the Defendant's closing argument, and it was made in response to what the Defendant had said in his closing argument and thus was not an improper shift of the burden of proof.
During his closing argument, the Defendant attacked the State's case and questioned the failure of the State to call certain witnesses who gave the police information about the crime. During its rebuttal closing argument, the State answered the Defendant's closing argument and questioned why the Defendant had not called these witnesses. The three witnesses specifically referred to were Jewel Simon, a neighbor of Daniel Dougay, who told a reporter that she heard gunshots at the shop on the Thursday before the murders; Donna Clark, the girlfriend of Jeffery Tezeno, who went to the shop on the Saturday morning after the murders; and Jay Volaire, an acquaintance of the Defendant and Tezeno, who gave the police *420 information about the activities of the Defendant and Tezeno on the weekend of the murders.
Under La.Code Crim.P. art. 774, closing arguments should be restricted "to evidence admitted, to the lack of evidence, to conclusions of fact that the State or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice." Generally, before a verdict will be overturned on the basis of improper argument, the reviewing court must be convinced the jury was influenced by the remarks and the remarks contributed to the verdict. State v. Moore, 432 So.2d 209 (La.1983), cert. denied, 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983); State v. Messer, 408 So.2d 1354 (La.1982).
The remarks the Defendant complains about clearly fall within those arguments permitted by Article 774. The State was simply rebutting the Defendant's arguments that commented upon the failure to call certain witnesses. Thus, this portion of the argument is without merit.
The second claim of the Defendant is that he was not allowed to argue at closing arguments that Jeffery Tezeno habitually carried a gun. The State objected that no evidence was presented, but the Defendant argues that several witnesses so testified. It is within the sole province of the jury to decide what the testimony has established and what it has not established. State v. Lee, 364 So.2d 1024 (La.1978). Whether or not Tezeno habitually carried a gun is a conclusion of fact the jury had to draw from the evidence presented. Even if the trial judge erred in sustaining the State's objection, reversal of the convictions would result only if this court finds that the jury was influenced by the remarks and the remarks contributed to the verdict. We find that the issue was tangential and thus could not have contributed to the verdict.

ARGUMENT NO. 8ASSIGNMENT OF ERROR NOS. 3, 4, & 5
This argument concerns objections during jury selection. Venue for jury selection was changed from Calcasieu Parish to East Baton Rouge Parish after the first attempt to select a jury resulted in a mistrial.
The Defendant first contends that the trial court failed to excuse for cause Charles Thibodeaux, Mark Daily, Pennie McGee, Kim Gobert, and Mavis Trevino. During jury selection, the Defendant exercised nine peremptory challenges but he did not exhaust all of the twelve peremptory challenges given him by La.Code Crim.P. art. 799.
La.Code Crim.P. art. 800 provides that "[a] defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him, unless an objection thereto is made at the time of the ruling. The nature of the objection and grounds therefor shall be stated at the time of objection." In 1983, Article 800 was amended to delete an additional requirement that the Defendant must exhaust all peremptory challenges before he could appeal the refusal to sustain a challenge for cause.
Under the new version of Article 800, a defendant is now permitted to complain of a ruling refusing to sustain his challenge for cause even if he had not thereafter exercised all of his peremptory challenges. State v. Vanderpool, 493 So.2d 574, 575 (La.1986). See also State v. Copeland, 530 So.2d 526 (La.1988). In such a case, the defendant must be able to show some prejudice in order to overcome the requirement of La.Code Crim.P. art. 921 that "[a] judgment or ruling shall not be reversed by an appellate court because of any error ... which does not affect substantial rights of the accused."
While La.Code Crim.P. art. 800, as amended in 1983, no longer requires that the defendant exhaust his peremptory challenges in order to assign as error the denial of a challenge for cause, that Article does not provide that the erroneous denial of a challenge for cause is automatically reversible error. The defendant must still demonstrate prejudice arising from the ruling. In the present case, the five jurors the Defendant claims the trial judge improperly denied challenges for cause were excused by the Defendant by exercise of his peremptory challenges. Therefore, the Defendant was not *421 forced to accept any juror he did not want. Furthermore, the Defendant did not exhaust all of his remaining peremptory challenges.
The Defendant's arguments concerning the improper denial of challenges for cause are without merit since the Defendant cannot show prejudice resulting from the trial court's rulings. See Copeland, 530 So.2d 526; Vanderpool, 493 So.2d 574; State v. Johnson, 595 So.2d 789 (La.App. 2 Cir.1992); State v. Burge, 498 So.2d 196 (La.App. 1 Cir.1986).
No prejudice exists in the present case because the prospective jurors were removed by peremptory challenge and the Defendant still retained three unused peremptory challenges at the close of jury selection. Even if the trial court's rulings were considered erroneous, under these circumstances, the ruling did not affect Defendant's substantial rights.
The Defendant also argues that Tatiana Bates was improperly excused for cause. A review of the voir dire examination of Ms. Bates reveals that she was excused for cause because she testified she could not impose the death penalty even if the State proved aggravating circumstances. There was no error in granting this challenge for cause.
Finally, the Defendant claims a Batson objection was made for Joseph Solete, but the State argues that Solete was excused for cause since he would not impose the death penalty. Actually, the Batson objection was not raised when Mr. Solete was excused, but was raised later when Mr. Demon Edwards and other prospective jurors were excused after the trial judge granted the State's challenges for cause. La. Code Crim.P.art. 800 provides in paragraph B, "the erroneous allowance to the state of a challenge for cause does not afford the defendant a ground for complaint, unless the effect of such ruling is the exercise by the state of more peremptory challenges than it is entitled to by law." The Defendant does not argue that the State was granted any additional peremptory challenges; in fact, the State exercised only five peremptory challenges during jury selection.
The prohibition against racially motivated removal of prospective jurors is found in La.Code Crim.P. art. 795(C) and it applies to peremptory challenges. The purpose of the rule of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) is to prevent the State from using peremptory challenges to exclude men and women from jury service solely on the basis of race. The Defendant in the present case simply makes conclusory allegations, but he does not point to any specific instance of the State peremptorily excluding a single black venireman solely on the basis of race. Furthermore, the Defendant does not complain that the trial judge improperly granted challenges for cause except for Ms. Bates.
Thus, this argument is without merit.
Finally, the Defendant argues he was improperly prevented from asking the prospective jurors their favorite Bible verses. Actually, the Defendant was able to ask one prospective juror, Kathryn Moore who ultimately served on the jury, what was her favorite Bible verse, but the State later objected to any further questions about favorite Bible verses. The trial judge told the Defendant he could ask about the prospective jurors' religion and religious beliefs, but the Defendant could not go into detail about their favorite Bible verses.
The Defendant cites in support of his argument State v. Lee, 559 So.2d 1310, (La.1990). The defendant in Lee had complained that he was unduly restricted in his voir dire questioning about how jurors felt if a defendant did not testify on his behalf. The Louisiana Supreme Court ruled:
This Court has specifically rejected the contention that unjustified restrictions on voir dire can be cured by a response on the part of the prospective juror that he will follow the law as given him by the judge when the juror is unaware of the complexity of the law and where that law involves such a basic right of the defendant.... Rather, counsel must be permitted to informally question the juror of his own experiences and attitudes that may influence his ability to follow the law. A juror's response to less imposing questions may *422 well reveal attitudes and biases not disclosed by superficially correct answers....
Id. at 1316 (citations omitted).
The Lee opinion further stated that defense counsel should be given "wide latitude" during voir dire, within reasonable limits, to explore the attitudes and experiences of the prospective jurors, but at the same time, the trial judge is given much discretion to limit voir dire as long as the defendant is not deprived of a reasonable opportunity to intelligently exercise his challenges. Although the Defendant has shown that he was denied the right to ask a specific question, this fact alone does not establish how the Defendant was deprived of effective voir dire. The ruling of the trial judge was within the discretion granted him by law.
This argument is without merit.

ARGUMENT NO. 9ASSIGNMENT OF ERROR NO. 18
The final argument of the Defendant concerns the trial court's refusal to include a special requested jury instruction on the credibility evaluations for snitches or informants. Unfortunately, that portion of the trial proceedings at which the Defendant objected to the failure to include his special requested instruction was not transcribed. The court minutes state:
Mr. Smith objects to portions of the Jury charge and states reasons. Mr. Smith files the defendant's Proposed Jury Instructions into the record. Mr. Bryant advises the Court that the State has no objections to the charge. Mr. Smith moves for a mistrial and states reasons. Mr. Smith further requests an instruction from the Court to the Jury. The Court denies the request for a mistrial.
The proposed jury instruction states:
The Court instructs the jury that the law looks with suspicion and distrust on the testimony of an accomplice or a snitch who provides evidence against a defendant for partial immunity from punishment, or for pay, or for other personal advantage. You should weigh this testimony with great care and caution and suspicion.
In judging the testimony of accomplices and snitches and deciding on what weight___ if any___ you should give this testimony, you should look upon it with distrust and suspicion and you should determine whether the testimony has been affected by his interest in this matter or his prejudice against the defendant. In deciding whether you believe the testimony of any accomplice or snitch in this case you should keep this in mind.
The jury instruction stated:
As jurors you alone determine the weight and credibility of the evidence. As the sole judges of the credibility of witnesses and of the weight their testimony deserves, you should scrutinize carefully the testimony of a witness, you may consider his or her ability and opportunity to observe and remember the matter about which he or she testified, his or her manner while testifying, any reason he or she may have for testifying in favor of or against the State or the Defendant, and the extent to which the testimony is supported or contradicted by other evidence.
La.Code Crim.P. art. 807 provides that "a requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given." We find that the charge given to the jury adequately explained their duty to determine credibility and the refusal to include the Defendant's requested charge was not error.

CONCLUSION
The convictions of the Defendant are affirmed. However, the sentences of the Defendant must be amended to grant him credit for time served. La.Code Crim.P. art. 880. Thus, we remand this case so that the district court may amend the commitment and minute entry of the sentence to reflect that the Defendant is given credit for time served. State v. Jones, 607 So.2d 828 (La.App. 1 Cir.1992), writ denied, 612 So.2d 79 (La. 1993).
*423 AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] The prosecution had also failed to provide Willie Fontenot's exculpatory statements (he had apparently denied knowing anything about the criminal activities that he later discussed on the stand), and Donald Washington's verbal perambulations.
[2] Indeed, Lewis should well have known that Cady was a drug dealer, since Ms. Mitchell would have provided important evidence that Lewis had used him as a snitch. Lewis used to come around the Mitchell house getting Cady to provide information. This, of course, would have provided one lead as to how Cady came to make up the story on Mr. Guillory.
[3] Rhonda Daniels (see below) was one of the victims of the theft crime for which Mickle Cady was first convicted. She allowed him to use her apartment, and then learned that Cady had stolen her furniture out of it. He was also charged with stealing a car from R.P. Dumas. The defense should have been allowed to go into the fact that Cady tried to pin this crime on another person. He told the officers that his cousin, Johnny Brimm, had asked him to drive the car, and that he had no knowledge of the car being illegally stolen. When the jig was up, he later changed his story and pled guilty.
[4] On January 6, 1983, Cady and Robert Mitchell were also arrested for the attempted second degree murder of Godfrey Mason. According to the District Attorney's Office at the time, this was when "Robert Mitchell supplied drugs to Michael Cady, co-defendant, to see and that one January 4, 1983, on the 500 block of Boston Alley in Lake Charles, La., Mason Godfrey took some drugs from Michael Cady without paying for them...." This charge was also dismissed against Cady.
[5] In terms of his efforts to continually avoid police custody by whatever means possible, the defense could also have shown that Cady had attacked Officers P. Vince and R. Curtis on June 2, 1987, in his efforts to escape custody. On October 21, 1991, he did the same thing with Officers M. Patrick and M. Rachal.
[6] Ms. Daniels could also testify that when she first started seeing Tezeno, she learned that she should not be seeing him because he was a "punk" (gay).
[7] Tezeno was strange because he wore a long fur coat that looked like a woman's coat in the winter. She heard then that he went both ways. This is how that he got his nickname, Chili, from a phrase that was used about him, "up the rear Chili."
[8] Thierry would also have shown that Tezeno was receiving favorable treatment at the CCC. The guards allowed him to stay out late and make as many phone calls as he wanted. Tezeno used his tier rep status to its fullest advantage and the guards let him do what he wanted. Tezeno got the tier rep position although he was more than once unwilling to clean up for an inspection.