# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-260


**STATE OF LOUISIANA**

**VERSUS**

**DANIEL BRANDON PRINCE**

**-AKA- DANIEL B. PRINCE**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. CR 72,189 I & II
HONORABLE KRISTIAN EARLES, PRESIDING JUDGE

\*\*\*\*\*\*\*\*\*\*

## JOHN D. SAUNDERS
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, John D. Saunders, and Shannon J. Gremillion, Judges.


## CONVICTIONS AFFIRMED; SENTENCES VACATED; REMANDED FOR RESENTENCING.

Cooks, J., dissents and assigns written reasons.

**Annette Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Daniel Brandon Prince**


**Roger P. Hamilton, Jr.**
**Assistant District Attorney**
**Fifteenth Judicial District**
**P. O. Box 2206**
**Lafayette, LA  70511**
**(337) 232-5170**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **State of Louisiana**

**SAUNDERS, Judge.**

On January 15, 2005, the badly-burned bodies of the victims, Angela Matte and Jackie Campbell, were found at the scene of a trailer fire in Acadia Parish. Campbell's remains were found on the floor of the bedroom, and Matte's remains were found on the bed springs. There was wire wrapped around Matte's neck. Neither the cause of the fire nor the victims' deaths were determined. However, evidence indicated that the women were dead before the fire and that Matte was strangled. A jailhouse informant told investigators, and later testified, that Defendant, Daniel B. Prince, confessed to killing the women and burning their bodies. The informant stated Defendant was in a bar in the Rayne area and met the victims. Defendant allegedly left the bar with them and went to a trailer with the victims. The informant stated Defendant told him he had sex with the women in the trailer. According to the informant, Defendant stated he hit one of the women in the throat and then got on top of her and strangled her to death. He then grabbed an extension cord and strangled the other woman. He then placed papers underneath the mattress and started a fire. A witness later stated he saw a man he identified as Defendant talking to the victims on the night of the murders, at the Little Easy, a bar in Rayne.

Defendant was arrested after being involved in a traffic stop while driving a silver Chevrolet pick-up truck, which had been reported stolen. Defendant confessed to stealing the truck and was arrested at that time. It was this arrest and subsequent incarceration at the Allen Correctional Center that led to the alleged admission to his jailhouse cell mate. Police later discovered a witness who saw a silver truck following the vehicle of one of the victims towards the trailer on the night of the murders.

An Acadia Parish grand jury indicted Defendant on October 11, 2007, charging him with two counts of first degree murder, violations of La.R.S. 14:30. Defendant entered a plea of not guilty to both charges on November 5, 2007. On that same date, the State declared its intent to seek the death penalty. The parties selected a jury on January 17-28, 2013, and the jury began hearing evidence on the latter date. On January 30, a unanimous jury found Defendant guilty as charged on both counts. In the penalty phase, the jury was deadlocked. On February 8, 2013, the district court sentenced Defendant to serve life in prison.

On September 30, 2013, Defendant submitted a Motion for Out of Time Appeal. That motion was denied without a hearing. Defendant sought review of the trial court's denial of his Motion for Out of Time Appeal, and on February 10, 2014, this court remanded the matter to the trial court for a hearing in accordance with *State v. Counterman*, 475 So.2d 336 (La.1985). *State v. Prince*, 13-1349 (La.App. 3 Cir. 2/10/14) (unpublished opinion). Upon remand, defense counsel submitted a "Motion for Out of Time Appeal Order (Or in Alternative – Hearing on Out of Time Appeal Order)" with an affidavit by Defendant's attorney stating Defendant did not waive his right to appeal. On July 3, 2014, the trial court signed an "Order on Motion for Out of Time Appeal," granting Defendant an out-of-time appeal.

On July 31, 2014, the State filed a writ application in this court, seeking review of the trial court's grant of the motion for out-of-time appeal. On August 12, 2014, this court granted the State's writ application, finding the trial court erred in granting the motion for out-of-time appeal on July 3, 2014, without conducting a *Counterman* hearing. *State v. Prince*, 14-789 (La.App. 3 Cir. 8/12/14) (unpublished opinion). This court reversed the trial court's grant of the out-of-time appeal and remanded for the evidentiary hearing. Defendant sought review in the

2

supreme court and was denied relief on April 2, 2015. *State v. Prince*, 14-1817 (La. 4/2/15), 163 So.3d 791.

Despite this court's August 12, 2014 dismissal of Defendant's out-of-time appeal and the pendency of Defendant's writ in the supreme court, an appeal was lodged in this court on January 30, 2015. While the appeal was pending in this court, defense counsel filed a "Motion for Hearing on Out of Time Appeal Order" in the trial court on April 15, 2015. The trial court held a hearing on May 21, 2015, but Defendant's trial counsel was not present. The trial court granted the out-of-time appeal.

On June 1, 2015, appellate counsel informed this court of the May 21, 2015 *Counterman* hearing and the trial court's grant of the out-of-time appeal. A few days later, this court issued a per curiam opinion dismissing Defendant's appeal. *State v. Prince*, 15-85 (La.App. 3 Cir. 6/3/15), 173 So.3d 906. It appears this court was not aware of appellate counsel's June 1, 2015 letter, because this court stated that the trial court had not yet held the *Counterman* hearing and had not granted a new out-of-time-appeal. Appellate counsel filed an application for rehearing on June 17, 2015, asking this court to reconsider its per curiam opinion in light of the trial court's May 21, 2015 grant of the out-of-time appeal. On July 29, 2015, this court denied the request for a rehearing.

Thereafter, on August 12, 2015, the State sought review of the trial court's May 21, 2015 grant of Defendant's out-of-time appeal by filing a writ application in this court. The State argued that it was denied its right to cross-examination. This court granted the State's writ application, stating the following:

> **WRIT GRANTED AND MADE PEREMPTORY:** The State should have had an opportunity to cross-examine trial counsel at the hearing conducted on May 21, 2015. The district court's ruling of that date is vacated, and the case is remanded for a hearing with live testimony, including the opportunity for cross-examination of any

3

witnesses and presentation of evidence by both parties, if deemed appropriate.

*State v. Prince*, 15-763 (La.App. 3 Cir. 11/20/15) (unpublished opinion).

On January 11, 2016, the trial court held a hearing, at which the State was able to cross-examine Defendant's trial counsel, Thomas Alonzo. The trial court granted the out-of-time appeal, and the appeal was lodged in this court on April 11, 2016.

Defendant has filed a brief alleging four assignments of error. For the reasons that follow, we affirm Defendant's convictions, vacate Defendant's sentences, and remand Defendant's sentences to the trial court for imposition of a separate sentence on each count of first degree murder in accordance with La.R.S. 14:30.

## ASSIGNMENT OF ERROR NO. 1:

In his first assignment of error, Defendant argues the trial evidence was insufficient to support his convictions. We find the trial evidence was sufficient to convict Defendant of both counts of first degree murder.

### I. State's Evidence.

Firefighter Dwayne Thevis responded to a fire on January 15, 2005, around 5:15 in the morning. Foy Credeur, Chief of the Branch Volunteer Fire Department in 2005, testified that the bodies of two women were found in the trailer that was on fire. Both victims were located in the south bedroom of the trailer, which suffered the heaviest damage. Monte Briggs of the Acadia Parish Coroner's Office testified that Campbell's body was on the floor. Matte's body was removed from the bed springs, at which point Briggs noticed a wire around her neck. Briggs noted that the wire looked like standard copper wire used in most electrical cords.

4

Zeb Johnson of the Calcasieu Parish Coroner's Office testified that the cord around Matte's neck appeared to be a lamp cord.

Dr. Terry Welke, accepted as an expert in the field of forensic pathology, was unable to determine the cause of the victims' deaths. Due to the low level of carbon monoxide in the victims' bodies, Dr. Welke opined that they were likely dead before the fire. When asked if the wire around Matte's neck could have been a necklace, Dr. Welke testified he did not think so but could not completely dismiss that possibility.

Several hours before the fire, John Babineaux saw the victims at a bar, the "Little Easy." Babineaux saw a guy on his cell phone talking with the victims. Babineaux described the guy as Caucasian, wearing a white-buttoned up shirt, and having a tattoo on his arm. When shown a photo line-up, Bandeaux identified Defendant as the man he saw socializing with the victims. When Babineaux left the bar at 1:30, the victims and Defendant were still there. On re-direct, Babineaux stated that Defendant was shooting pool at the bar that night.

Gary Daigle testified he was with Babineaux at the "Little Easy" on January 14, 2005. Daigle remembered seeing the victims at the bar that night. Daigle also remembered that one of the victims, Campbell, "took interest in" a guy playing pool. Daigle described the guy as slim, kind of tall, wearing a white muscle shirt, having a goatee, and having tattoos on his arm. On cross-examination, Daigle testified that he thought the guy Campbell was interested in was named "Dustin." Daigle also read from a previously made statement wherein he stated he saw another guy at the bar and that guy was interested in the other victim, Matte.

Cordtney Otten testified that during the early morning hours of January 15, 2005, she saw the victims being followed by a truck. The victims lived a few houses down from Otten. Later, when Otten woke up to use the bathroom, she saw

5

a truck going really fast out of the victims' driveway. Otten described the truck as silver and thought the truck was a Chevrolet. On cross-examination, Otten stated she did not remember seeing anything in the back of the truck. Although Otten testified she thought the truck's windows were tinted, she also stated she did not remember. Otten admitted, however, that in a statement she gave on September 7, 2005, she said there was a toolbox in the back of the truck, and she stated the windows of the truck were tinted.

Approximately two weeks after the victims were found dead, Defendant was apprehended in Lafayette Parish while driving a silver Chevy truck that had been stolen on December 29, 2004. Sergeant Kim Verrett of the Vermillion Parish Sheriff's Department testified that on December 29, 2004, she investigated the theft of a silver 2005 Chevy truck. The truck was recovered when it was stopped while being driven by Defendant. According to Sergeant Verrett, Defendant admitted to taking the truck. On cross-examination, Sergeant Verrett testified that she could not see a toolbox in the photograph of the truck. As for the tint of the windows, Sergeant Verrett testified the windows appeared to be either rolled down or not tinted.

Deputy Kip Judice testified he took Defendant into custody after pulling him over and determining he was driving a stolen truck. According to Deputy Judice, the truck did not have a toolbox. Deputy Judice also testified the truck's windows were not tinted.

A brown leather jacket, a black leather jacket, two muscle shirts, blue jeans, and boxers were collected from the stolen truck Defendant was driving. No DNA from either victim was detected on the items recovered from the truck.

Although Defendant was ultimately determined to be the main suspect in the murders, Detective Phyllis LeJeune of the Acadia Parish Sheriff's Office testified

6

that Jason Fruge was considered a suspect early in the investigation. Fruge was dating Matte's daughter. Fruge was already at the scene of the fire when the fire truck arrived, and, according to one of the deputies, was dressed in his fire gear. Another person saw Fruge at the scene "standing and observing."

Detective LeJeune testified that one of the officers at the scene told her that Fruge was acting strangely. According to another witness, Fruge had been a suspect in other fires in the Branch area. Detective LeJeune testified that Fruge was a suspect in a subsequent fire that occurred on June 13, 2005 in a nearby area.

When Detective LeJeune took Fruge's statement on January 15, 2005, she noticed that he had bruises on his face and hands. According to the detective, she later learned that Fruge had the bruises a week to two weeks before the date in question.

Jeremy Matte contacted the police and stated he was told by Jason Fruge that he had started the fire. The police chose to disregard Jeremy Matte's statement, because he was related to Angela Matte.

Detective LeJeune developed Defendant as the main suspect because she received information that he was inside the bar, and she received a letter and voluntary statement from Michael Hayes stating Defendant confessed to the murders. Defendant was identified by John Babineaux in a photographic line-up as a person he saw talking to Campbell in the Little Easy.

Michael Hayes testified that he and Defendant were in the same dorm at Allen Correctional Center. During one of their conversations, Defendant asked Hayes if a fire would destroy DNA evidence. Defendant eventually told Hayes that he killed two women. According to Hayes, Defendant told him the following:

> A. He said he was in a bar in Rayne and they had a party going on.
> A girl had a birthday. And he was up there drinking and everything.
> And he said that they had come up and asked him to dance, and he

7

said he didn't dance but he ended up playing pool with them. And he said they bought him some drinks, and when they pulled out to pay for the drinks there was some – he noticed a large sum of money and everything. He said that, you know, that went on for a while and then he left and he went back to a place he was staying.

Q. And what happened?

A. He returned back to the bar, went in there again and went to talking to them. If I remember right, he said he had a friend of his that called him about some other business they had going on. And then he said they had called for the last alcohol, the last drink, and he had went outside before they did. And then when they came out he said, "Luck would have it, that I just happened to park right next to them." He said, "We started talking, and they asked me did I want to go with them?" And he said, "Yeah, but y'all leave first." And so they left first. He said there was another person in the parking lot with a girl leaning over the door, over talking to him, he said, but he didn't think they'd seen him. And he said, well, they left and so he pulled out a little bit later so people wouldn't see him following. And he noticed that they had pulled over on the side of the road so he kind of slowed down behind them, flashed the lights and they went on. He said they came to Branch, Louisiana and went down like a dirt road to a trailer house.

Q. And what happened?

A. He said that he went to the back with the one lady, and said that they had had intercourse. And the other girl stayed up front. And he said they eventually had a conversation about her coming back there, too, and they had hollered for her. The other girl had hollered for her but she wouldn't come back there, so he went up to get her. He said that they had smoked a joint and went to talking. And then he went on back to the back and eventually she came back there, and he said he had intercourse with both of them. He then said that one girl was kind of getting jealous of the other one, because the one he was originally back there with was showing him more attention. And I'm going to say, the heavy set girl started getting upset and wanted him to leave, and telling him to leave, that she was going to call the law and have him throwed out. And he said he hit her in her throat with his fist and she fell down beside the bed, like gasping for air. And he got down on top of her and strangled her. He made a big deal out of the fact that the other girl never made - she was emotionless. She never screamed, never nothing. He said he thought that she thought they were going to be an item or something. And he said after he strangled her, you know, he knew he couldn't leave a witness so he grabbed an extension cord from an electric heater and he strangled the other girl with it. He said then he took the money they had. He said it was about Twenty-five Hundred Dollars ($2,500.00). Then he said he had a lot of trouble getting the heavy girl back up on the bed, and he thought about trying to make - start a fire with the electric heater but he had

8

pulled the extension cord out and he didn't know how long it would take for that to catch up on fire. So he piled a bunch of paper underneath the mattress and started it on fire. And he said it went quicker than he thought it would go. And so he got out of the house and he got in the vehicle. He said he started to take their car, but then he said they could link it to him, so he got in the truck. And he went up the road and he realized he was going to [sic] the wrong way. He said there was a woods [sic] between that trailer then another trailer. And so when he turned around and come back it was completely engulfed in flames, and he realized he had left the extension cord around that one girl's neck. He wanted to make it look like the house just caught on fire. And he said he left.

One of the points defense counsel attempted to make at trial was that Hayes could have learned about the wire found around Matte's neck from someone other than Defendant. Chief Credeur testified that although they were instructed not to say anything about the wire, everyone at the scene knew that something was wrapped around Matte's neck. When asked if the wire around Matte's neck was common knowledge in the Branch community, Chief Credeur replied, "Probably so." According to Detective Phyllis LeJeune, the fact that wire was found around Matte's neck was not released to the public. However, Detective LeJeune acknowledged she could not keep the information from getting out, but believed the information did not get out since there were not many people at the scene when the wire was discovered. Detective LeJeune did state when she questioned Jeremy Matte, he knew about the wire. Detective LeJeune did not know how Jeremy found out about the wire. Jeremy testified he heard a rumor that a cord was found around Matte's neck. Hayes testified he did not know any of these facts prior to his conversation with Defendant.

When asked if he was given any benefit or promised anything for his testimony, Hayes replied, "No." Hayes also testified he had no grudge against Defendant and testified because it was the right thing to do.

9

On cross, defense counsel accused Hayes of being a liar because of his previous convictions of forgery and identity theft. At the time of his testimony, Hayes was still on parole. When asked if he was a paid snitch, Hayes replied, "Absolutely not." Defense counsel showed Hayes a DOC document that said in July 2009, Hayes had $16,521.00 in his prison account. Hayes explained that he worked there for almost two years. When asked about his prior convictions, Hayes stated that his first conviction was in 2005 and was for identity theft. Subsequently, when asked why he told the trial court in March 2011, that he had only one felony conviction in 2006 instead of two felony convictions (forgery and identity theft), Hayes replied:

> A.   Well, I think it's probably a misunderstanding. And let me tell you why I think that.
>
> Q.   Okay. All right.
>
> A.   You're counting felony arrests. I'm counting as a first offender. Everything was run concurrent. I was put in prison over one (1) sentence.

Later, when Hayes was further questioned about telling the court he was a first felony offender even though he was actually a second felony offender, Hayes continued to explain that he believed he was a first offender since the sentences were ordered to run concurrently.

When questioned about the fact that his sentences were eventually "reduced" to eight years, Hayes agreed that in 2006 he received a notice from the Department of Corrections that he was serving a thirteen-year sentence. Hayes explained that before he went to Phelps Correctional, his prison "rap" sheet indicated that his sentence was eight years. When he arrived at Phelps, the "rap" sheet indicated his sentence was thirteen years. At that time, Hayes asked the trial court in Sabine Parish to clarify how it intended the sentences to be served. According to Hayes,

the trial court stated that it intended the sentences to be served concurrently. When defense counsel asked Hayes if he had his sentence reduced after becoming a snitch, the following colloquy took place:

A.    No, sir, I didn't have it reduced, I had it clarified.

Q.    Excuse me. It was clarified for you - - (interrupted)

. . . .

**BY ALONZO – CONTINUED:**

Q.    So, the clarification in your sentence from thirteen (13) years to eight (8) years occurred after you became a rat, right?

**BY THE WITNESS:**

A.    Okay. Will you allow me to explain something?

Q.    Sure. Yes, sir.

A.    Okay. When I went to prison I got eight (8) years. I voluntarily revoked myself on the first charge, the five (5) years. There's no use – I did it. There was no use to continue to fight anything; do it, get over it and move on in my life. I voluntarily got with them, I revoked myself. The Judge – it's in your minutes, also, sir. You can read. Before I ever wrote a statement on him – that it's eight (8) years. But every prison you go to has a computation department. And each one of them people, they read something differently. At every prison I went to except the last one, it was always eight (8) years.

Q.    Okay. Fair enough. I'm sorry. Were you finished?

A.    And when I got to Phelps they did compute (sic) it, read the five (5) and the eight (8) and made it a thirteen (13). I argued it out saying it was to be ran concurrently together, and so it would be the five (5) is ate up by the eight (8), it would be eight (8) years. I didn't have any of my paperwork. And I had noone [sic] that could get it, so all I could do was to write a motion and have the Judge reclarify it. I did that. They changed it back to the original eight (8) that it was before I ever, what you want to call, snitched on him.

Hayes testified that he did not know his lawyer sent a letter to the District Attorney asking for Hayes to be paroled in exchange for his testimony against Defendant. Defense counsel introduced a letter written by Hayes' attorney to

11

District Attorney Mike Harson. In the letter, Hayes' attorney stated that he wanted the District Attorney's assistance in getting Hayes paroled in exchange for his testimony against Defendant. Although he testified he did not know about the letter, Hayes said he did tell his attorney to "get this parole fixed for me." When asked if he had some charges dismissed in December 2007, after he became a snitch, Hayes responded, "Yes, sir." Hayes explained that the charges were for "bank fraud" and were dismissed because "the statute of limitations run out on them."

Detective LeJeune testified that Hayes never asked for a reduction in his jail time. The detective testified that she would be surprised to hear Hayes hired a lawyer to seek a reduction in his sentence in exchange for his testimony. Detective LeJeune stated that she believed Hayes.

## II. Defense Witnesses.

Kami Richard, a barmaid at the Little Easy in Rayne, testified that on January 14, 2005, she saw two women at the bar, and she remembered it was one of the women's birthday. Richard remembered seeing one of the women trying to flirt with a man having tattoos and wearing a leather jacket. According to Richard, the man did not seem interested in the woman. Richard thought the man left before the women left, but she was not sure. After being shown her previous statement, Richard testified that the man with the leather jacket left before the women left. Richard thought the women left with another man.

The owner of the Little Easy Bar, Charmaine Gallet Billings, testified there were about twenty-five to thirty people in the bar the night the victims were there. Billings remembered escorting the victims out of the bar at about 1:45, closing time. Billings acknowledged that in her statement, she said the victims left with "a little grey haired man."

12

Jason Domingue testified that after the fire, he found a duffel bag in a field about a mile and a half to two miles from the fire. The duffel bag had a ski mask in it. Defendant was excluded as a contributor of DNA found on the mask.

Brian Fontenot, the arson and fire investigator for the Louisiana State Fire Marshal's Office in January 2005, testified that Jason Fruge was initially a suspect in the fire. Fontenot testified that although he could not confirm that Fruge was a suspect in other fires, he knew that Fruge was involved in other fires. Additionally, Fontenot testified that Fruge may have been part owner of a property that caught fire after the fire in question. On cross-examination, Fontenot acknowledged that he has never arrested Fruge for arson.

David Clark, who lived near the scene of the fire, testified he smelled smoke when letting his dog out at dawn. He walked towards the fire, and stated when the sheriff shined his spotlight at the smoking trailer, Jason Fruge appeared in the smoke. Clark testified that Fruge was not in his fireman clothes. Accordig to Clark, no other policemen or firemen were at the scene at that point. Clark stated that Jason Fruge was the first person he saw come out of the vicinity of the fire.

Jessica Trahan, Matte's daughter, testified that three days before she died, Matte expressed displeasure with her other daughter, Dana, for dating Jason Fruge and for "doing drugs." According to Trahan, her mom was trying to get Dana to quit dating Fruge. Two weeks earlier, Trahan had a conversation with her mom regarding the fact that Fruge knew her mom did not want him dating Dana. Trahan could not remember the specifics of the conversation, so defense counsel had her read her previous statement:

A. (Witness examines document.) "We were sitting down talking and she was telling me how she was going to have to find a new place to live and a new job because she just seen trouble coming there and stuff. Then I asked her, you know, what was the problem and stuff about her not being around - - Then I asked her, you know, what the

problems and stuff about her not being around Jason because he wasn't a good influence on her, and Dana must have told Jason or something because Jason found out. And at work he had cornered my mom when she was throwing out trash out the back door, and she, whenever she was going to go back in the corner, her, and he put his hand on the screen door or on the door and he told her, 'Look, you need to keep your f---ing nose out of me and Dana's business or you're going to find yourself in a roaring fire and I'm the f---ing person to do it.' My mom . . ." (Crying by witness.)

When asked why she was suspicious of Fruge after her mom was murdered, Trahan responded:

A.   Because he ended up saying that. I mean, naturally you would think that. As soon as we found out, you know, she was murdered, we were looking for answers.

Q.   But also, he had some marks on his face, remember?

A.   He had a scratch under his eye and nose, but my sister – my sister said – Dana told me that it was whenever he fell out of the truck. She was with him when it happened before my mom had passed away. She was in the truck with him.

On cross-examination, Trahan stated now she did not think either Dana or Fruge had anything to do with her mom's death.

Lavence Matte, the ex-husband of Angela Matte, testified he spoke with Matte the day before her death. When asked if Matte expressed concern about Jason Fruge, Matte responded:

A.   Yes, sir.

Q.   Tell me specifically what she told you.

A.   We got back to her house, and, of course, she got out. She says, "I need to tell you something."

Q.   Would you speak into the speaker phone just - - (interrupted)

A.   When I got there – of course, she got out the car. She says, "I need to tell you something." I said, "What do you want to tell me." My little girl, Shelby, was with me, which we made Shelby get out the car and walk to see her little brothers, her little half-brothers. She started to cry and she says, "Baby, I was threatened." I said, "What you mean you was threatened?". She said, "Jason threatened me. He

14

said if I didn't stay out of him and Dana's relationship he was going to kill me and burn me in the trailer and get away with it because he was a volunteer fireman." And she cried. I said, "Do you want me to talk to him?", I said, "There's no danger with that little worm. He ain't going to do nothing." She said, "No, don't talk to him. I'm scared." That's about all she had to say on that.

The next witness for the defense, Kayla Comeaux, testified that Jason Fruge dated her cousin, Tessa. A few months after the fire, Comeaux heard Fruge say that he started the fire because he was mad at Tessa. Comeaux further explained: "They were fighting. I guess he said it to scare her, but he said he put a gallon of gas over some candles and that's how he did it."

The final witness to testify was Dr. Dean Foster, who was accepted as an expert in corrections and sentencing. According to Dr. Foster, Michael Hayes was in Allen Correctional Center in December 2006, for twenty-three days–a time during which Defendant was also there. After about a week of being in the same dorm as Defendant, Hayes contacted the Fire Marshal's Office. Dr. Foster testified that he was asked to look at Hayes' file for any unusual occurrences after Hayes came forward as an informant. According to Dr. Foster, some really good things began happening to Hayes right after he became an informant. Hayes was transferred to a better prison and was ultimately placed in the lowest security state prison. Second, he was quickly promoted to inmate counsel substitute. Third, Dr. Foster mentioned the fact that Hayes' sentences were amended from consecutive to concurrent. Dr. Foster explained how the modification occurred as follows:

A. I mean, there is a sentencing history there. He got the five (5) year sentence initially, and then the next year he came back on additional charges and got an eight (8) year sentence. And as he explained in Court yesterday afternoon, he had his probation revoked at that time, although not exactly under the circumstances that he described, but had his probation revoked and the Judge at that time, at the probation revocation the Judge imposed a five (5) year sentence on him and did not specify in the minutes whether it was to be concurrent or consecutive. And the rule is under the Code of Criminal Procedure 883, that if it's not specified concurrent, then it becomes consecutive.

So, the DOC officials were just following their rules, which says if the Judge doesn't say concurrent, it's consecutive. So, as far as they were concerned, he was serving an eight (8) year sentence and a five (5) year sentence. So, you have to serve one (1), or half (1/2) of one under his Good Time rules before you get into serving the other half (1/2), the other sentence.

Q. And just to be clear, that became – excuse me – that changed after he became a snitch?

A. After he became a snitch he went back to Sabine and the two (2) sentences were rolled back into one (1) eight (8) year concurrent sentence.

When asked what happened when Hayes went to work for the work release

program in Lake Charles, Dr. Foster explained:

A. I've read through the reports, yes. He was supposed to be working at one address, but he was being delivered each day to a different address, which was a house, according to the reports, that were [sic] owned by either him or his girlfriend, and spending time there during the day instead of being on the job site where he was supposed to be working.

Q. Was he committing any kind of fraud upon the State by doing that?

A. He was violating the terms of work release, so he was subject to any charges that would result from that.

Q. I'm trying to determine, was he double-dipping, working somewhere else and getting paid somewhere else, too; do you know?

A. I have no idea about his finances. What appears in the record is how much money he had in his account at the halfway house when he was sent back into State custody for violating the terms of work release, which was Sixteen Thousand Five Hundred and Twenty-one Dollars ($16,521.00) that he had accumulated in the fifteen (15) months that he was working at the work release facility.

Q. Did you find that unusual?

A. It's a good sum of money. It depends upon that job that he has, you know, how much he's working and other things. It's more than ordinary. I was involved with halfway house facilities in Lafayette, and somebody who was working offshore at a good job that really couldn't spend much money out of their account would sometimes accumulate, you know, One Thousand Dollars ($1,000.00) a month or more. So, not obviously fraudulent or anything incorrect about it.

16

Q.    Okay, that's fair.

A.    But unusual. I mean, it was more money than most inmates would earn; yes.

Q.    And did anything else happen that was unusual after he gets charged with the escape?  He goes up -- What happens next?

A.    Well, he's returned to State custody. He's put in jail in Calcasieu then he's transferred back into Hunt, which is the Adult Reception Diagnostic Center at St. Gabriel.  He goes back to Hunt for a few weeks.  He has his disciplinary hearing there, in which -- Well, it's postponed twice, and then when he goes to the hearing he's found not guilty of escape, where there's another charge which is just kind of general prohibited behavior.  But he is found guilty of what's called 21H, which is a consensual sexual offense while in custody.

Q.    What was that about?

A.    I don't have the details of the report, so, you know, I don't know who he was having sex with. I think I know from, you know, from the description of the violation who he was having sex with, but I can't tell you what went on at the disciplinary hearing.

Q.    Okay.

A.    He was not charged with a criminal offense.

Q.    Okay.

A.    They have a separate court in the DOC that handles disciplinary matters that's called an Escape Court. They would deal with that kind of context. So, the Escape Court is very serious, because if you're found guilty of escape from this kind of facility - if you just run away from the halfway house then they would take away all of your good time. So, he would have lost all of his good time that he had accumulated, four (4) years of good time that would have seriously impacted his release date from prison.

Q.    How would that have -- What would have been the effect if he gets caught, if he gets that -- (interrupted)

A.    He wouldn't have been discharged in 2009 at his - the September 16th release date that he was scheduled for, he would still be in prison today if he had not, if he had not - if his good time had been cancelled for escape or for violating the rules. They could have charged him with escape and taken it all away, or a serious disciplinary violation, they would have - the punishment can be up to one hundred eighty (180) days of good time removal for the sexual activities or other rule violations, they can take away up to one hundred eighty (180) days for that. But he had no time taken away.

17

Q.      So, if that had happened, what you just explained, he would have shown up here yesterday in an orange suit with handcuffs on, right?

A.      He would still be in custody. I don't know how he would have been dressed; but, yeah.

When asked if he believed Hayes received special treatment after becoming

a snitch, Dr. Foster replied:

A.      All of the good things that happened to him after he came forward as a snitch, in my opinion, the combination of occurrences was very unusual; like, you know, like he had a guardian angel over his shoulder watching his progress through the system.

*Legal Analysis*

The analysis for insufficiency of the evidence claims is well-settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Defendant suggests the informant, Michael Hayes, could have learned about

the wire found wrapped around Matte's neck by someone other than Defendant.

Although the lead investigator indicated the information regarding the wire was

withheld from the public, some testimony elicited by Defendant suggested the

presence of the wire could have been known in the community.  Defendant also

18

observes that he was not seen leaving the bar with the victims, there was no showing that his DNA was at the scene, and when he was arrested, his only injuries were a few scratches on his wrist.

Defendant further observes that Hayes testified that Defendant told him he took twenty-five hundred dollars from the victims. However, the testimony of Cordtney Otten, a friend of the victims, suggested it was highly unlikely that the victims would be in possession of that amount of money. One victim worked as a waitress, and the other victim also did restaurant work. Defendant complains the State presented no evidence that either victim possessed such an amount of money and presented no motive for the murders.

Also, Otten's description of the truck she saw differed from the truck Defendant was apprehended in. She described a truck with a toolbox and tinted windows, but the truck Defendant was apprehended in lacked either feature. It was also established at trial that Otten and Jason Fruge were related. Detective LeJeune testified he believed Otten was Jason Fruge's half-sister.

Defendant also notes Jason Fruge was considered a suspect in the murders, and was seen near the trailer while it was still aflame. There was conflicting testimony as to whether Fruge was at the scene in his fire gear. Angela Matte's daughter and ex-husband testified that a few days before her death, the victim had told them that Fruge had threatened to burn down the trailer with her in it. Another witness, Kayla Comeaux, claimed that Fruge had confessed to burning the trailer. Defendant also alleges that Fruge was implicated in other fires in the area.

In addition, Defendant argues Hayes' testimony that Defendant used a heater cord as a ligature and considered using the heater to start the fire did not comport with the testimony that there was no heater in the trailer. Finally, Defendant

emphasizes the testimony of Dr. Foster that jailhouse informants, also known as jailhouse "snitches," are unreliable.

In its brief, the State argues that it presented evidence through the testimony of Michael Hayes that Defendant committed the murders and started the fire. The jury, the State asserts, chose to believe Hayes. Additionally, the State asserts Defendant presented his theory that Jason Fruge was the perpetrator, and the jury did not find this theory plausible.

Defendant's thesis here, as it was at trial, is that Hayes is a liar who benefitted from testifying for the State. The evidence is clear that there was no DNA evidence tying Defendant to the murders. Clearly, the jury could only have reasonably found Defendant guilty by accepting as true the testimony of Michael Hayes.

We are unwilling to say on appellate review that the evidence was insufficient to convict Defendant of the murders of Angela Matte and Jackie Campbell. This assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2:

In his second assignment of error, Defendant argues the district court erred by overruling Defendant's objections to the State's opening statement. He also cites jurisprudence for the standard of review:

> If the appellate court finds that the prosecutor's argument contained improper remarks, a reversal is warranted only if the court is thoroughly convinced that the jury was influenced by the remarks and that they contributed to the verdict. *State v. Jarman*, 445 So.2d 1184 (La.1984). Credit should be accorded to the good sense and fairmindedness of jurors who have heard the evidence. *State v. Dupre*, 408 So.2d 1229 (La.1982); *State v. Dilton* [*Robinson*, 490 So.2d 501 (La.App. 4 Cir. 1986)]. *State v. Deboue*, 496 So.2d 394, 403 (La.App. 4 Cir. 1986), *writ denied*, 501 So.2d 229 (La.1987).

The following colloquy occurred during the State's opening statement:

20

**BY MR. HAMILTON:**

As humans evil is among us every day in a different shape -- (interrupted)

**BY MR. ALONZO:**

Judge, I object. I'd like to approach the bench, Your Honor.

[WHEREUPON, A SIDEBAR CONFERENCE WAS HELD.]

**BY MR. ALONZO:**

Did he just say, "As humans evil is among us every day."?

**BY MR. HAMILTON:**

Yes.

**BY MR. ALONZO:**

Judge, that's totally improper argument.

**BY MR. HAMILTON:**

No, it's not. I can say whatever I want. This is opening statements.

**BY MR. GARROT:**

No, you can't say whatever you want.

**BY MR. ALONZO:**

No, you can't. Judge, he can argue the facts of the case. He can't talk about crime outside of the courthouse, "Evil is among us every day." Everybody is scared about crime. That's not what this case is about. That's totally improper argument.

**BY MR. HAMILTON:**

It's an abstract theory.

**BY MR. ALONZO:**

You cannot argue -- (interrupted)

**BY MR. HAMILTON:**

It's abstract, it is not argument.

**BY MR. ALONZO:**

You cannot argue -- (interrupted)

**BY MR. HAMILTON:**

This is an abstract – (interrupted)

**BY MR. ALONZO:**

Judge, I'd like to know where he's going so we can question this. I'm sorry, Judge. I don't think that's proper.

**BY MR. HAMILTON:**

This is an abstract statement. It's not specifically going anywhere. I mean -- (interrupted)

**BY THE COURT:**

I don't think he referred to anybody with that statement. It's just a general statement. And I'll overrule your argument at this time, provided that you don't continue along those lines.

**BY MR. HAMILTON:**

Okay.

**BY THE COURT:**

In other words, we're going to get to the case at hand.

**BY MR. HAMILTON:**

Yeah, I will get to it.

**BY THE COURT:**

I'll note your objection.

**BY MR. ALONZO:**

Okay. Thank you, Judge.

        . . . .

**OFF THE RECORD**

**BACK ON RECORD**

**BY THE COURT:**

If y'all do have problems -- We're going to unplug them. If you have problems hearing, let us know.

**OFF THE RECORD**

**BACK ON RECORD**

**BY THE COURT:**

All right. Continue.

**BY MR. HAMILTON:**

As humans evil is among us every day in different shapes, a different color, a different form. The dictionary defines evil as the fact of suffering and wrongdoing, or something that brings sorrow, distress or calamity. Evil has no limit as to who it will victimize. Evil will strike at dawn, during the day or at night.

What is evil? Evil is the wrongs that people do. We must protect our communities from evil acts.

**BY MR. ALONZO:**

Judge, if we could make another objection. I apologize, Your Honor, but we have to make another objection on the record, Judge.

**BY THE COURT:**

Okay. Come on around.

**[WHEREUPON, A SIDEBAR CONFERENCE WAS HELD.]**

**BY MR. ALONZO:**

Judge, let me just state the basis for my objection and reiterate it, Your Honor. I know it's somewhat redundant, but, Judge, you cannot argue to the community that it's dangerous out there, it's evil out there. This is about this case and about the facts of this case and about whether or not Danny Prince did that. You can't try to scare the jury to make them render an improper verdict. And that's what he's doing. "It's dangerous out there. There's crime out there." Your Honor, that's totally improper. That's the basic 101 - - (interrupted)

**BY MR. GARROT:**

Your Honor - - (interrupted)

**BY THE COURT:**

Okay, only one (1) argument. We're not going to have both arguing.

23

**BY MR. GARROT:**

Yes, sir.

**BY THE COURT:**

And I understand your argument. And I would imagine you're just about - - (interrupted)

**BY MR. HAMILTON:**

Yeah. I'm just about done. I've got a couple of more sentences and then I'll get into this case. I mean, it's totally improper that they don't allow me to argue – not argue, but give my opening statement. These statements, I've given numerous juries and have never had any problems with - - (interrupted)

**BY THE COURT:**

I've overruled your objection.

**BY MR. ALONZO:**

Okay, Judge. Just note - - (interrupted)

**BY MR. GARROT:**

Please note our objection.

Later, Defendant renewed his objection and asked the trial court to instruct the jury to disregard the State's remarks. The trial court advised that it would consider giving an instruction to the jury to disregard the State's comments and to not consider sympathy and prejudice. During its closing instructions to the jury, the trial court instructed the jurors that opening statements and closing arguments were not to be considered as evidence and that they were not to be "influenced by sympathy, passion, prejudice, or public opinion." As Defendant notes, the State returned to the theme of "evil" in its closing argument. However, Defendant did not object at that point. Appellate counsel suggests an objection during closing

24

argument would have been fruitless since the trial court had already denied Defendant's challenge to the "evil" line of argument.

Appellate counsel asserts the State's comments were "improper, immaterial, irrelevant and beyond the permissible scope of opening and closing statements as set forth in Articles 766 and 774." Louisiana Code of Criminal Procedure Article 766 states the following regarding the scope of the State's opening statement:

> The opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge.

Louisiana Code of Criminal Procedure Article 774 states the following regarding the scope of closing argument:

> The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state's rebuttal shall be confined to answering the argument of the defendant.

Appellate counsel also asserts that the State's remarks violated Rule 3.4(e) of the Rules of Professional Conduct:

> A lawyer shall not:
> . . . .
> (e)  In trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused . . . .

La.Rules Prof.Conduct, Rule 3.4(e).

The supreme court has explained:

> Prosecutors may not resort to personal experience or turn argument into a plebiscite on crime. *State v. Eaton*, 524 So.2d 1194, 1208 (1988), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989); *State v. Barrow*, 410 So.2d 1070, 1075 (La.), *cert. denied*, 459 U.S. 852, 103 S.Ct. 115, 74 L.Ed.2d 101 (1982); *State v. Prestridge*, 399 So.2d 564 (La.1981). However, before this court will reverse on the basis of improper argument it must be thoroughly convinced the jury was influenced by the remarks and such

25

contributed to the verdict. *Eaton, supra.* "In making this determination, the court gives credit to the good sense and fair-mindedness of the jury." *Eaton*, 524 So.2d at 1208. *See also Taylor*, 93-2201 at p. 21, 669 So.2d at 375.

*State v. Williams*, 96-1023, p. 15 (La. 1/21/98), *opinion corrected* (La. 5/28/98), 708 So.2d 703, 716, *cert. denied*, 525 U.S. 838, 119 S.Ct. 99 (1998).

Defendant appears to acknowledge that the remarks at issue are subject to a harmless error analysis.

In addition to La.Code Crim.P. art. 766, the State, in its brief, cites La.Code Crim.P. art. 770, regarding mistrial:

Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;

(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;

(3) The failure of the defendant to testify in his own defense; or

(4) The refusal of the judge to direct a verdict.

An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

The State argues that its comment during the opening did not fall within the purview of La.Code Crim.P. art. 770.

The State also notes La.Code Crim.P. art. 771:

In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a

nature that it might create prejudice against the defendant, or the state, in the mind of the jury:

(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or

(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.

In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

While Defendant objected to the remarks at issue, he did not request a mistrial. As mentioned earlier, Defendant renewed his objection after the opening. The trial court stated that it would advise the jury not to be moved by emotion and ultimately gave such an instruction. Thus, we find the dictates of La.Code Crim.P. art. 771 were satisfied.

We also find there is little likelihood the remarks influenced the jury and contributed to the verdict. Pursuant to *Williams*, we find that the possible influence of the remarks does not rise to the level of thoroughly convincing this court that they improperly influenced the verdict. As discussed in the previous assignment of error, the core of the case was the credibility of Michael Hayes, whose testimony was corroborated by other evidence at trial and obviously believed by the jury. The State's appeal to the general idea of evil did not clearly have a bearing on the credibility issue. Also, a true contemplation of general evil might just as easily have led the jury to doubt Hayes. It is clear he is not a "model citizen," and the district court allowed Defendant to explore the issue of whether Hayes was merely trying to save his own neck at Defendant's expense.

For the reasons discussed, this assignment lacks merit.

## ASSIGNMENT OF ERROR NO. 3:

In his third assignment of error, Defendant alleges the State introduced false testimony from Michael Hayes, thus violating *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct 1173 (1959). The supreme court has stated the following regarding a *Napue* violation:

> This contention implicates the decision in *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). To prove a *Napue* claim, the accused must show that the prosecutor acted in collusion with the witness to facilitate false testimony. When a prosecutor allows a state witness to give false testimony without correction, a conviction gained as a result of that perjured testimony must be reversed, if the witness's testimony reasonably could have affected the jury's verdict, even though the testimony may be relevant only to the credibility of the witness. *Id.* at 269, 79 S.Ct. 1173. Furthermore, fundamental fairness to an accused, i.e., due process, is offended "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed 2d 104 (1972).
>
> *State v. Broadway*, 96-2659, p. 17 (La. 10/19/99), 753 So.2d 801, 814, *cert. denied*, 529 U.S. 1056, 120 S.Ct. 1562 (2000).

Defendant attempts to characterize Hayes' trial testimony as false. Defendant states that at a pretrial hearing, Hayes claimed to be a first offender, but at trial he acknowledged having two convictions. Defendant claims this should have alerted the State that Hayes' credibility was suspect. Defendant also argues that while some charges in Hayes' background, such as bank fraud, may have been properly excluded from use in cross-examination, they should also have led the State to doubt its own witness's truthfulness.

Defendant also argues that during trial, the State failed to clarify with Hayes whether he knowingly had his attorney seek help from the State to obtain parole in exchange for his testimony against Defendant. Further, he argues the State failed to clarify with Hayes whether he had ever actually applied for parole.

28

In its brief, the State contends that *Napue* is distinguishable since the State did not solicit Hayes to speak with Defendant and since Hayes was not given any benefits in exchange for his cooperation. The State notes that Hayes was already incarcerated with Defendant when Defendant engaged Hayes in a conversation about the murders. The State further asserts Defendant's confession to Hayes was an admission by a party and, thus, not hearsay. Finally, the State contends defense counsel was allowed wide latitude in cross-examining Mr. Hayes as to his prior convictions.

As noted by appellate counsel, the following is the standard to be used in determining whether a new trial should be granted because of a *Napue* violation:

> [T]he grant of a new trial based upon a *Napue* violation is proper only if: (1) the statements at issue are shown to be actually false; (2) the prosecution knew they were false; and (3) the statements were material.

> *State v. Reel*, 10-1737, p. 16 (La.App. 4 Cir. 10/3/12), 126 So.3d 506, 517, *writ denied*, 12-2433 (La. 4/12/13), 111 So.3d 1018 (citation omitted).

In *Napue*, it was determined that the State knew that a witness lied when the witness denied that he had been promised consideration for his testimony against Napue. Thus, the first two of the above requirements were met. The court in *Napue* further determined that "[h]ad the jury been apprised of the true facts, . . . it might well have concluded that Hamer had fabricated testimony in order to curry the favor of the very representative of the State who was prosecuting the case in which Hamer was testifying . . . ." *Id.* at 1177. Thus, the *Napue* court concluded:

> As previously indicated, our own evaluation of the record here compels us to hold that the false testimony used by the State in securing the conviction of petitioner may have had an effect on the outcome of the trial. Accordingly, the judgment below must be reversed.

> *Napue,* 79 S.Ct. at 1177.

29

In the present case, we find Defendant has failed to prove his *Napue* claim. Although Defendant raises suspicions as to Hayes' credibility, Defendant fails to prove that Hayes' testimony was false, much less that the State knew it was false.

As to Hayes' testimony regarding his first/second offender status, we find that Hayes was thoroughly questioned at trial and explained his confusion as to his offender status. Hayes' alleged "false" testimony regarding whether he knew his attorney requested help with his parole was also thoroughly examined in front of the jury. Thus, it did not go "uncorrected." Furthermore, a comparison of Hayes' trial testimony with the testimony given by his attorney at a pre-trial hearing does not show Hayes' trial testimony was false. At trial, Hayes said he did not know his attorney sent a letter requesting help with his parole. Although the attorney copied Hayes with the letter, he did not know if Hayes received the letter. At the pre-trial hearing, Hayes' attorney did testify that Hayes knew of his efforts to get him paroled in exchange for his testimony. At trial, Hayes testified that he told his attorney to get his parole "fixed." Thus, Defendant has failed to prove that Hayes testified falsely at trial.

Finally, the issue of whether Hayes received any benefits in exchange for his testimony against Defendant was explored in detail during defense counsel's cross-examination of Hayes as well as during the testimony of Dr. Foster, Defendant's expert on Corrections and Sentencing.

The supreme court has explained:

This Court has held on numerous occasions a witness's "hope or knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest." *State v. Brady*, 381 So.2d 819, 821-22 (La.1980); *see also State v. Vale*, 95-1230, p. 4 (La.1/26/96), 666 So.2d 1070, 1072. "It is difficult to imagine a greater motivation to lie than the inducement of a reduced sentence, but courts uniformly hold that such a witness may testify so long as the government's bargain with him is fully ventilated so that the jury can evaluate his credibility." *United States v. Cervantes-Pacheco*,

30

826 F.2d 310, 315 (5th Cir.1987) (footnote omitted). Moreover, *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) and *Giglio* [*v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766 (1972)] both hold, when the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure by prosecutor of evidence going to the credibility of a witness denies the defendant due process. *Napue*, 360 U.S. at 269, 79 S.Ct. at 1177; *Knapper*, 579 So.2d at 959.

*State v. Garcia*, 09-1578, pp. 51-52 (La. 11/16/12), 108 So.3d 1, 37, *cert. denied*, __ U.S. __, 133 S.Ct. 2863 (2013).

Even though Hayes claimed he received no benefit in exchange for his testimony against Defendant, we find the issue of whether or not he received a benefit was explored before the jury. Thus, we find that Defendant fails to prove that Hayes' testimony was improperly submitted to the jury and, thus, failed to prove that he is entitled to a new trial. For the reasons discussed, this assignment lacks merit.

## ASSIGNMENT OF ERROR NO. 4

In this assignment of error, Defendant asserts the trial court erred in overruling his request for a "great caution" jury instruction regarding the testimony of Michael Hayes. We do not find merit in this assignment of error. For the reasons that follow, we find the jury was properly instructed as to the great caution it must use when weighing snitch testimony.

On July 5, 2011, Defendant filed a "Motion for Special Jury Instructions Regarding Snitch Testimony." The proposed jury instruction reads as follows:

An incentivized witness is defined as one who may be eligible for some benefit as a result of his assistance in the investigation or prosecution of another person. Whether the witness was involved in the offense for which Defendant is charged or not, corroboration is desirable, but it is not always indispensable. The jury may convict on his uncorroborated testimony. And while it is not the rule of law, it is rather the rule of our experience in dealing with that class of testimony that while you may convict upon the uncorroborated testimony of an incentivized witness, still you should act upon his testimony with great caution, subject to careful examination of the weight of the other evidence in this case. And you are not to convict

31

upon such testimony alone unless satisfied, after a great careful examination of its truth, that you feel you can safely rely on it. What the law means by corroboration of the testimony of an incentivized witness is not merely the corroboration of the witnesses narrative and the mere details of how the crime was committed, but some real and independent corroboration tending to implicate Defendant in the commission of the offense charged. It is not sufficient to corroborate an incentivized witness as to the facts of the case. Generally, he should be corroborated as to some material fact which tends to prove that the accused was connected with the crime that's charged. In determining the reliability of the testimony of an incentivized witness you should take into account several factors indicating the extent to which his testimony is credible, including: 1) explicit or implied inducements that the witness received, may receive, or will receive; 2) the prior criminal history of the witness; 3) evidence that the witness is a "career informant" who has testified in other criminal cases; and 4) any other factors that might tend to render the witness' testimony unreliable.

When the trial court addressed this motion, it stated that it would defer its ruling until the charging conference just prior to the jury's retirement for deliberations. At the jury charge conference, defense counsel asked the trial court about the "snitch testimony" instruction that had been previously discussed. The following colloquy occurred regarding the requested charged:

**BY ALONZO:**

Judge, I know it doesn't say that in the record, but what it does say, Your Honor, what it says is that if there is no other corroborating – I can't say that word.

**BY GARROT:**

Corrobo (sic).

**BY ALONZO:**

- - corroborating evidence in addition to the testimony of the snitch then that's the appropriate charge. And in this case, there is no other testimony that corroborates the testimony of Hayes.

**BY HAMILTON:**

There is corroborating - -

(Interrupted)

**BY THE COURT:**

I disagree. The trier of fact could conclude something otherwise because of the other witnesses to some of these other things.

**BY ALONZO:**

I think the jury needs to be instructed, particularly in this case, because it is critical to the State's case, the snitch testimony, that that type of testimony is looked upon with suspicion by judges like you, Judge, and by jurors in general.

**BY THE COURT:**

I'm not giving that charge, but I'll - -

(interrupted)

**BY ALONZO:**

Just note our objection for the record.

**BY THE COURT:**

I'll note your objection.

**BY ALONZO:**

It's under *State versus Divers.*" [sic]

The trial court gave the jury the following instruction regarding the

evaluation of witnesses:

> As jurors you alone determine the weight and credibility of the evidence. As the sole judges of the credibility of witnesses and of the weight of their testimony deserves, you should scrutinize carefully the testimony and circumstances under which the witness has testified. In evaluating the testimony of a witness, you may consider his ability and opportunity to observe and remember the matter about which he testified, his manner while testifying, any reason he may have for testifying in favor of or against the State or Defendant, and the extent to which the testimony is supported or contradicted by the evidence.
>
> The testimony of a witness may be discredited by showing that the witness will benefit in some way by Defendant's conviction or acquittal, that the witness is prejudiced, or that the witness has any other reasons or motive for not telling the truth.

The issue is whether the trial court abused its discretion in failing to give the great caution instruction requested by Defendant.

The court in *State v. Divers*, 38,524, p. 13 (La.App. 2 Cir. 11/23/04), 889 So.2d 335, 352-53, *writ denied*, 04-3186 (La. 4/8/05), 899 So.2d 2, *cert. denied*, 546 U.S. 939, 126 S.Ct. 431 (2005), discussed "great caution" instructions in cases involving uncorroborated snitch testimony:

> Such "great caution" instructions are required when a case involves uncorroborated accomplice testimony. However, such instructions are not mandatory where an accomplice's or snitch's testimony is materially corroborated. *State v. Castleberry*, 1998-1388 (La.4/13/99), 758 So.2d 749, *cert. denied*, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999). Testimony is materially corroborated "if there is evidence that confirms material points in an accomplice's tale, and confirms Defendant's identity and some relationship to the situation."
>
> *State v. Schaffner*, 398 So.2d 1032, 1035 (La.1981); *State v. Castleberry*, supra.

The need for such an instruction is due to the fact that "'rewarded informant testimony' may be inherently untrustworthy." *Perry v. New Hampshire*, 132 S.Ct 716, 728 (2012), citing *Kansas v. Ventris*, 556 U.S. 586, 594, 129 S.Ct. 1841 (2009).

In *Divers*, the Second Circuit found that the trial court's denial of Defendant's requested jury instruction was ***not*** an abuse of discretion because the "snitch" testimony was corroborated. The "snitch" testimony in *Divers* was given by an individual with "about 12 felony convictions" in the first trial and by the second trial "had about 16 convictions." *Divers*, 889 So.2d at____.

Testimony is materially corroborated "if there is evidence that confirms material points in an accomplice's tale, and confirms Defendant's identity and some relationship to the situation." *State v. Schaffner,* 398 So.2d 1032, 1035 (La.1981).

34

Here, the "snitch" testimony was corroborated because other evidence confirmed that Defendant had contact with the two ladies on the night of the murders while shooting pool at a bar. Further, other evidence confirmed that Defendant was driving a silver truck, and a silver truck was seen on the night of the murders driving to and from the location of the murders.

Neither the State nor Defendant mentions the fact that the above jury charge was given to the jury. Appellate counsel's argument that the "great caution" jury instruction should have been given presumes that the instruction given by the trial court was not sufficient.

This court has found a very similar instruction to be sufficient. In *State v. Guillory*, 97-179, p. 40 (La.App. 3 Cir. 3/11/98), 715 So.2d 400, 422, *writ denied*, 98-955 (La. 10/9/98), 726 So.2d 17, Defendant requested the following proposed jury instruction:

> The Court instructs the jury that the law looks with suspicion and distrust on the testimony of an accomplice or a snitch who provides evidence against a defendant for partial immunity from punishment, or for pay, or for other personal advantage. You should weigh this testimony with great care and caution and suspicion.
>
> In judging the testimony of accomplices and snitches and deciding on what weight–if any–you should give this testimony, you should look upon it with distrust and suspicion and you should determine whether the testimony has been affected by his interest in this matter or his prejudice against Defendant. In deciding whether you believe the testimony of any accomplice or snitch in this case you should keep this in mind.

Instead of giving the above proposed instruction, the trial court in *Guillory* instructed the jury as follows:

> As jurors you alone determine the weight and credibility of the evidence. As the sole judges of the credibility of witnesses and of the weight their testimony deserves, you should scrutinize carefully the testimony of a witness, you may consider his or her ability and opportunity to observe and remember the matter about which he or

35

she testified, his or her manner while testifying, any reason he or she may have for testifying in favor of or against the State or Defendant, and the extent to which the testimony is supported or contradicted by other evidence.

*Id.*

Finding the trial court's refusal to include Guillory's requested charge was not error, this court stated:

> La.Code Crim.P. art. 807 provides that "a requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given." We find that the charge given to the jury adequately explained their duty to determine credibility and the refusal to include Defendant's requested charge was not error.

*Id.*

Since the charge given in the present case was very similar to the charge given in *Guillory*, this court finds the jury in the present case was adequately explained its duty to determine credibility; thus, the trial court's refusal to include the requested "great caution" charge was not error.

As stated previously, appellate counsel's argument assumes that no "great caution" instruction was given or that the instruction given by the trial court was not sufficient. Thus, appellate counsel's argument focuses on whether or not such an instruction was required in the present case. This court finds the instruction that was given satisfied the requirement of a "great caution" instruction, and no further analysis is necessary.

Appellate counsel argues there was little corroboration of the material points of Hayes' testimony. Further, appellate counsel asserts that almost all of the details to which Hayes testified were common knowledge in the Branch community. The details that were not common knowledge, appellate counsel contends, were inconsistent with other testimony. Appellate counsel argues:

36

With regard to the wire found around the neck of one of the victims, despite the detective's testimony that this fact was kept quiet, it was common knowledge in the community within a month of the fire. Additionally, Hayes testified that Prince told him it was a cord to a heater. The daughter of Angela Matte stated there was no heater in the room. Further, no determination was made as to whether the wire was a cord or a piece of jewelry. Additionally, Hayes testified that Prince stole twenty-five hundred dollars from the women; other witnesses said it was highly unlikely they would have had that much cash. Due to the inconsistencies with other evidence and lack of material corroboration of the snitch's testimony, the limiting instruction was proper.

The State, on the other hand, asserts that Hayes' testimony was corroborated, obviating the need for a "great caution" instruction:

In the case at bar, Hayes provided details of the crime that corroborated other witnesses' statements. Defendant provided Hayes with a story where he met the women at a bar and went back to the trailer with them. Those statements were corroborated by John Babineaux. Moreover, Defendant's cell phone records placed him in the area and making a telephone call on his cell phone. There is further evidence that Defendant used a wire to strangle on the [sic] victims and fled in a truck once he started the fire. The truck was seen by Cordtney Otten. Furthermore, the coroner and investigators confirmed that a wire was around the neck of Angie Matte when they found her body.

As discussed in the first assignment of error, we agree that Hayes' testimony was corroborated–there was evidence that confirmed material points of Hayes' testimony as to what Defendant told him, and there was evidence that confirmed Defendant's relationship to the crime. Thus, even if this court had found the instruction given by the trial court to be insufficient, we must consider the discretion given to the trial court to run a jury trial and the great deference given to jury verdicts, thus a "great caution" instruction was unnecessary in the present case, and it is not required that these instructions be given.

**DECREE**

Defendant's convictions are affirmed. Defendant's sentence, however, is vacated and remanded to the trial court for imposition of a separate sentence on each count of first degree murder in accordance with La.R.S. 14:30.

**CONVICTIONS AFFIRMED; SENTENCES VACATED; REMANDED FOR RESENTENCING.**

STATE OF LOUISIANA

VERSUS

DANIEL BRANDON PRINCE
-A/K/A- DANIEL B. PRINCE


**COOKS, J., dissenting.**

I respectfully dissent from the majority opinion's affirmance of Defendant's conviction. While I am reluctant at any time to set aside a jury's verdict, I find the trial court abused its discretion in failing to give the required appropriate great caution instruction, which may have precluded the jury from reaching a verdict based on the law and facts. Therefore, I would vacate the jury's verdict and remand the matter to the trial court for a new trial.

Defendant maintains here, as he did at trial, that Michael Hayes is a liar who received numerous benefits in exchange for testifying for the State. As the majority opinion notes, the evidence is clear that there was no DNA evidence tying Defendant to the murders. Thus, the jury could only have found Defendant guilty by accepting as true the testimony of Michael Hayes. I find merit in Defendant's assignment of error that the trial court erred in overruling his request for a great caution jury instruction relating to the "snitch testimony" of Michael Hayes. Had the jury been properly cautioned as to the longstanding rule that accomplice and snitch testimony is inherently unreliable and still chose to accept as true the testimony of Michael Hayes, the jury's decision to believe Michael Hayes could suffice to support Defendant's conviction. However, for the reasons that follow I find the jury was not properly instructed as to the great caution it must use when weighing snitch testimony.

As the majority noted, Defendant's appellate counsel assigned as error the trial court's decision to overrule his request for a "great caution" jury instruction regarding the snitch testimony of Michael Hayes. Defendant filed a "Motion for Special Jury Instructions Regarding Snitch Testimony." The proposed jury instruction reads as follows:

> An incentivized witness is defined as one who may be eligible for some benefit as a result of his assistance in the investigation or prosecution of another person. Whether the witness was involved in the offense for which the defendant is charged or not, corroboration is desirable, but it is not always indispensable. The jury may convict on his uncorroborated testimony. And while it is not the rule of law, it is rather the rule of our experience in dealing with that class of testimony that while you may convict upon the uncorroborated testimony of an incentivized witness, still you should act upon his testimony with great caution, subject to careful examination of the weight of the other evidence in this case. And you are not to convict upon such testimony alone unless satisfied, after a great careful examination of its truth, that you feel you can safely rely on it. What the law means by corroboration of the testimony of an incentivized witness is not merely the corroboration of the witnesses narrative and the mere details of how the crime was committed, but some real and independent corroboration tending to implicate the defendant in the commission of the offense charged. It is not sufficient to corroborate an incentivized witness as to the facts of the case. Generally, he should be corroborated as to some material fact which tends to prove that the accused was connected with the crime that's charged. In determining the reliability of the testimony of an incentivized witness you should take into account several factors indicating the extent to which his testimony is credible, including: 1) explicit or implied inducements that the witness received, may receive, or will receive; 2) the prior criminal history of the witness; 3) evidence that the witness is a "career informant" who has testified in other criminal cases; and 4) any other factors that might tend to render the witness' testimony unreliable.

The trial court refused to give that charge and instead gave the following charge to the jury:

> As jurors you alone determine the weight and credibility of the evidence. As the sole judges of the credibility of witnesses and of the weight of their testimony deserves, you should scrutinize carefully the testimony and circumstances under which the witness has testified. In evaluating the testimony of a witness, you may consider his ability and opportunity to observe and remember the matter about which he testified, his manner while testifying, any reason he may have for testifying in favor of or against the State or the defendant, and the

2

extent to which the testimony is supported or contradicted by the evidence.

The testimony of a witness may be discredited by showing that the witness will benefit in some way by the defendant's conviction or acquittal, that the witness is prejudiced, or that the witness has any other reasons or motive for not telling the truth.

Instructing a jury to consider the reasons and motives a witness may have for testifying, is a far cry from instructing the jury as to the inherent unreliability of snitch testimony. A review of the trial court's instruction clearly shows it comes well short of instructing the jury that it must use great caution when weighing the credibility of snitch testimony. Thus, the issue becomes whether the trial court abused its discretion in failing to give the great caution instruction requested by Defendant.

As the majority set forth, the court in *State v. Divers*, 38,524, p. 13 (La.App. 2 Cir. 11/23/04), 889 So.2d 335, 352, *writ denied*, 04-3186 (La. 4/8/05), 899 So.2d 2, *cert. denied*, 546 U.S. 939, 126 S.Ct. 431 (2005), found "'great caution' instructions are required when a case involves uncorroborated accomplice testimony." This caution is required because snitch testimony is inherently untrustworthy. *Kansas v. Ventris*, 556 U.S. 586, 594, 129 S.Ct. 1841 (2009).

I find in the present case, given the fact the State's case hinged almost entirely on the testimony of Michael Hayes, the jurisprudence requires there to be material corroboration. A review of the record shows there was little, if any, corroboration of the material points of Hayes' testimony.

The State argues the fact Hayes' knew about the wire found around one of the victim's neck, corroborates his testimony. I do not agree. Although the lead investigator testified the information regarding the wire was withheld from the public, there was significant testimony elicited at trial suggesting the presence of the wire was common knowledge in the community. Chief Credeur testified that although they were instructed not to say anything about the wire, everyone at the

3

scene knew that something was wrapped around Ms. Matte's neck. When asked if the wire around Ms. Matte's neck was common knowledge in the Branch community, Chief Credeur replied, "**Probably so**." Detective Phyllis LeJeune acknowledged she could not keep the information about the wire from getting out but believed the information did not get out since there were not many people at the scene when the wire was discovered. However, Detective LeJeune did state when she questioned Jeremy Matte, he knew about the wire. Detective LeJeune did not know how Jeremy found out about the wire. Jeremy testified he heard a rumor that a cord was found around Ms. Matte's neck. It is apparent from the record that the information concerning the wire or cord found around Angela Matte's neck was likely known by the public. Therefore, Hayes' inclusion of this particular fact does little to corroborate his overall testimony.

Hayes also testified that Defendant said he stole $2,500.00 in cash from the women. However, Cordtney Otten testified it was unlikely that either of the victims would be in possession of that amount of money. One victim worked as a waitress, and the other victim also did restaurant work. The State presented no evidence that either victim possessed such an amount of money. The State also offered no evidence that Defendant was seen with a large sum of money in the days following the fire. The record is devoid of any trial evidence corroborating the testimony that Defendant said he stole $2,500.00 in cash from the victims.

The State acknowledges the lynchpin of its case is the testimony of Michael Hayes. There are only two other points, independent of Hayes' testimony, that the State used to build its case against Defendant: 1) He was one of several men at the bar where the two victims were last seen alive; and 2) he was stopped driving a truck that generally resembled one seen near the fire.

Although phone records placed Defendant in the area of the bar, he had admitted he was present in the bar that evening. Charmaine Billings, the owner of

4

the Little Easy Bar, testified there were about twenty-five to thirty people in the bar that evening. Ms. Billings remembered escorting the victims out of the bar at closing time. Kami Richard, a barmaid at the Little Easy, testified on the evening in question she remembered seeing one of the women trying to flirt with a guy having tattoos and wearing a leather jacket. According to Ms. Richard, the guy did not seem interested in the woman. Ms. Richard testified the guy left before the women left, which was the same as in her previous statement. Ms. Richard thought the women left with another guy.

Defendant did admit to stealing a silver truck from another area and driving it. Cordtney Otten testified during the early morning hours on the date in question, she saw a silver truck proceeding behind the victim's vehicle. She also stated, hours later, after waking up to use the bathroom, she saw a silver truck driving quickly out of the victim's driveway. Alluding to the "fortuitous" circumstances that allowed Ms. Otten to see, several hours apart, the silver truck both coming and going, Defendant points out Ms. Otten is related to Jason Fruge, who was considered a suspect in the murders. Detective LeJeune testified Jason Fruge was Ms. Otten's half-brother. Defendant also notes Ms. Otten's description of the truck was erroneous on several key factors. She stated in her statement to police the truck had a tool box in its bed and had tinted windows. Defendant also notes during her testimony Ms. Otten stated she did not see a tool box in the back of the truck that morning, until she was confronted with her earlier statement in which she stated she did see a tool box in the truck. The silver truck Defendant was stopped in weeks later did not have a tool box nor tinted windows. These discrepancies, plus the fact she was related to another suspect in the murders, mitigates against any material corroboration with Michael Hayes' testimony.

I find the lack of material corroboration, combined with other factors, required the trial court to give a great caution instruction. The fact there was no

5

direct evidence linking Defendant to the murders, combined with the reality that there was a plausible alternative suspect in the murders along with evidence that Michael Hayes received numerous benefits for his cooperation, necessitated the special "snitch" instruction.

Dr. Foster, an expert in Corrections and Sentencing, testified that "after [Hayes] became a snitch he went back to Sabine [Corrections Center] and the two (2) sentences were rolled back into one (1) eight (8) year concurrent sentence." Dr. Foster concluded "[a]ll of the good things that happened to him after he came forward as a snitch, in my opinion, the combination of occurrences was very unusual; like, you know, like he had a guardian angel over his shoulder watching his progress through the system."

There was testimony from two witnesses that Jason Fruge threatened to set fire to Angela Matte's trailer. There was also testimony Mr. Fruge was one of the first people seen at the scene of the fire. Authorities also testified he was a suspect in these murders and was also a suspect in other incidents of arson in the area.

While the jury was given a general charge relating to the credibility of witnesses, it was not given the requested special charge on the inherent unreliability of snitch testimony. Given the lack of material corroboration of Michael Hayes' testimony as set forth above, along with the lack of direct evidence tying Defendant to the murders, as well as the expert testimony noting the significant benefits Mr. Hayes received in exchange for his testimony, I feel it was an abuse of the trial court's discretion to not caution the jury as requested by Defendant. Accordingly, I would vacate the jury's verdict and judgments of the lower court, and remand the matter for a new trial.

6